John A.V. Nicoletti
Nooshin Namazi
Kevin J.B. O'Malley
NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiff*
Wall Street Plaza
88 Pine Street, Seventh Floor
New York, New York 10005
(212) 220-3830

JUDGE TORRES

# 14 CV     7453



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AGCS MARINE INSURANCE COMPANY,

                Plaintiff,

vs.

ANHEUSER-BUSCH INBEV SA/NV,
ANHEUSER-BUSCH, LLC (d/b/a IMPORT
BRANDS ALLIANCE), ANHEUSER-BUSCH
INBEV BELGIUM NV/SA, AB INBEV UK
LIMITED, ANHEUSER BUSCH INBEV
INTERNATIONAL GMBH & CO. KG and XYZ
CORPORATIONS 1-10, said names being
fictitious,

                Defendants.

**COMPLAINT**

     Plaintiff AGCS Marine Insurance Company, by and through its attorneys, as and for its

Complaint against Defendants Anheuser-Busch InBev SA/NV, Anheuser-Busch, LLC (d/b/a

Import Brands Alliance), Anheuser-Busch InBev Belgium NV/SA, AB InBev UK Limited,

Anheuser Busch InBev International GmbH & Co. KG and XYZ Corporations 1-10, said names

being fictitious, alleges the following upon information and belief:

**PARTIES**

1.      Plaintiff AGCS Marine Insurance Company is a corporation duly organized and existing under and by virtue of the laws of the State of Illinois with a principal place of business in the State of Illinois.

2.      AGCS is an insurance company that is licensed to do business in the State of New York as a foreign insurer.

3.      The "home office" of AGCS' underwriting and claims departments is located in New York, New York.

4.      Decisions by AGCS concerning the handling of the claim that is the subject of this insurance coverage dispute were and are made in New York, New York.

5.      Defendant Anheuser-Busch InBev SA/NV is a business entity duly organized and existing under and by virtue of the laws of a foreign state with a principal place of business in a foreign state and, therefore, a citizen or subject of a foreign state.

6.      Anheuser-Busch InBev is listed on and its shares are traded on the New York Stock Exchange, which is a stock exchange located in New York, New York.

7.      Anheuser-Busch InBev has its functional management office located in New York, New York.  According to a January 2009 press release issued by Anheuser-Busch InBev, this office hosts "functional management heads together with members of their marketing, finance, people, supply and legal teams."

8.      Defendant Anheuser-Busch, LLC is a limited liability company duly organized and existing under and by virtue of the laws of the State of Missouri with a principal place of business in the State of Missouri.

9.      Anheuser-Busch, LLC was created in 2011 by the conversion of Anheuser-Busch, Incorporated into a limited liability company.

10.      Anheuser-Busch, LLC does business under the fictitious name "Import Brands Alliance."

11.      Anheuser-Busch, LLC is registered to do business in the State of New York as a foreign limited liability company, with a registered agent located in New York, New York.

12.      Defendant Anheuser-Busch InBev Belgium NV/SA is a business entity duly organized and existing under and by virtue of the laws of a foreign state with a principal place of business in a foreign state and, therefore, a citizen or subject of a foreign state.

13.      Anheuser-Busch InBev Belgium, either in person or through an agent, regularly ships goods to the Port of New York and/or regularly contracts to supply goods in the State of New York and derives substantial revenue from goods consumed in the State of New York.

14.      A portion of the goods that are the subject of this insurance coverage dispute were shipped by Anheuser-Busch InBev Belgium to the Port of New York and were intended for consumption in the State of New York.

15.      Defendant AB InBev UK Limited is a business entity duly organized and existing under and by virtue of the laws of a foreign state with a principal place of business in a foreign state and, therefore, a citizen or subject of a foreign state.

16.      AB InBev UK, either in person or through an agent, regularly ships goods to the Port of New York and/or regularly contracts to supply goods in the State of New York and derives substantial revenue from goods consumed in the State of New York.

17.     Defendant Anheuser Busch InBev International GmbH & Co. KG is a business entity duly organized and existing under and by virtue of the laws of a foreign state with a principal place of business in a foreign state and, therefore, a citizen or subject of a foreign state.

18.     Anheuser Busch InBev International, either in person or through an agent, regularly contracts to supply goods in the State of New York and derives substantial revenue from goods consumed in the State of New York.

19.     Anheuser Busch InBev International was the seller of the portion of the goods that are the subject of this insurance coverage dispute that were shipped to the Port of New York and intended for consumption in the State of New York.

20.     Defendants XYZ Corporations 1-10, said names being fictitious, are parent, subsidiary, associated, affiliated or interrelated corporations or companies of Anheuser-Busch, LLC and/or Anheuser-Busch InBev Belgium and/or AB InBev UK and/or Anheuser Busch InBev International and/or are members of Anheuser-Busch, LLC who have an interest in the goods that are the subject of this insurance coverage dispute.

21.     Anheuser-Busch, LLC, Anheuser-Busch InBev Belgium, AB InBev UK, Anheuser Busch InBev International and XYZ Corporations 1-10 are direct or indirect subsidiary, associated, affiliated or interrelated companies or corporations of Anheuser-Busch InBev. (The Defendants are collectively referred to herein as "Anheuser-Busch.")

22.     Anheuser-Busch is in the business of brewing and distributing several brands of beer.

**JURISDICTION AND VENUE**

23.     The following issues constitute questions of insurance coverage under a contract of marine insurance and thereby come within the admiralty or maritime jurisdiction of this Court pursuant to 28 U.S.C. § 1333.

24.     This is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

25.     This action is filed under and pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201.

26.     An actual controversy of a justiciable nature exists between AGCS and Anheuser-Busch involving the rights and obligations under a contract of marine insurance and, depending on the construction of said contract, the aforesaid controversy can be determined by a judgment of this Court without further suit.

27.     This Court has personal jurisdiction over each Defendant under the laws of the State of New York, including N.Y. C.P.L.R. §§ 301 and 302.

28.     Venue is proper in this District as to each Defendant because each Defendant is subject to personal jurisdiction in this District.

**UNDERLYING FACTS – THE INSURANCE POLICY**

29.     AGCS provides certain insurance coverage to Anheuser-Busch under the terms and conditions of Marine Open Cargo Policy No. OC9118300 (the "Policy").  A true and correct copy of the Policy is attached hereto as Exhibit "1" and is incorporated herein by reference.

30.     The period of the Policy is continuous until cancelled, and coverage separately attached to shipments made on and after May 1, 2010.  Certain terms and conditions (including, but not limited to, premium) were thereafter periodically adjusted by endorsement.

31.     The Policy contains the following terms and conditions, among others:

1.      THE INSURED:

Anheuser-Busch InBev and its subsidiary, associated, affiliated and interrelated companies, and joint ventures in which it now has or hereafter may have a direct or indirect insurable interest and other entities for whom they may have instructions to insure or deem themselves responsible to insure, as their respective interests may appear (hereinafter referred to as "The Insured").

\* \* \*

16.     CONDITIONS OF COVERAGE:

16.1    All goods and/or merchandise and/or property, except those listed in Sub-Clause 16.2.6, are insured:

Against all risks of physical loss or damage from any external cause, except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty and/or other warranties or exclusions specified in this policy unless covered elsewhere herein, irrespective of percentage.

\* \* \*

17.     WAREHOUSE TO WAREHOUSE AND MARINE EXTENSION:

17.1    Notwithstanding anything to the contrary contained in or endorsed on this policy, it is understood and agreed that the following terms and conditions shall apply to all shipments:

17.1.1  This insurance attaches from the time the goods and/or merchandise and/or property leave the warehouse, store or other location at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues until the goods and/or merchandise and/or property are delivered to the final warehouse, store or other location at the

6

destination named in the policy, special policy, certificate or declaration, or a substituted destination as provided in Sub-Clause 17.1.3 below.

\* \* \*

19.   LOADING/UNLOADING:

This insurance is extended to cover, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, goods and/or merchandise and/or property intended for shipment (i) during the loading process prior o dispatch (including, into containers, trailers and rail cars) and continuing thereafter while they await the commencement of the transit and (ii) after they arrive at the final destination, and continuing thereafter, until they are promptly unloaded (including, from containers, trailers and rail cars) and throughout the unloading process.

\* \* \*

22.   INTERRUPTION OF TRANSIT:

Notwithstanding anything to the contrary contained in or endorsed on this policy, this insurance is extended to cover goods and/or merchandise and/or property insured under this policy whenever same are stopped in transit, anywhere in the world, short of final destination, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy.

\* \* \*

28.   CONTROL   OF   DAMAGED   GOODS   AND/OR MERCHANDISE AND/OR PROPERTY:

28.1   Notwithstanding anything to the contrary (including the Brands and Trademarks Clause and the Labels Clause) contained elsewhere in this policy, it is understood and agreed that in case of damage to goods and/or merchandise and/or property insured under this policy, The Insured is to retain full and absolute discretion and control over the disposition of all such goods and/or merchandise and/or property. It is understood that The Insured shall be

7

the sole judge as to whether disposal or sale of such goods and/or merchandise and/or property is detrimental to its interest.

28.2   Any goods and/or merchandise and/or property which The Insured deems unfit for sale or which it is unable to sell or dispose of under its agreement with any trade association or other entity, shall be treated as a constructive total loss, and The Insured shall dispose of the goods and/or merchandise and/or property to its best advantage with This Insurer being entitled to its share of the net proceeds resulting from such disposition, or the goods and/or merchandise and/or property shall be destroyed after notification to This Insurer and any expenses incurred in connection with such destruction shall be borne by This Insurer. This Insurer shall be given the opportunity to have a representative in attendance during such destruction.

* * *

36.   <u>DEMURRAGE CHARGES</u>:

If The Insured is directed by This Insurer to retain a container, trailer or rail car and if The Insured is assessed a late penalty and/or demurrage charge for the holding of the container, trailer or rail car past the return date, This Insurer will pay late penalties and demurrage charges. The amount This Insurer will pay shall be the charges assessed until such time as This Insurer and The Insured agree that the container, trailer or rail car may be released.

* * *

44.   <u>SUE AND LABOR</u>:

44.1   In the case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for The Insured, its factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and/or merchandise and/or property insured hereunder, or any part thereof, without prejudice to this insurance.

44.2    The acts of The Insured or This Insurer in recovering, saving and preserving the insured goods and/or merchandise and/or property in case of disaster shall not be considered a waiver of an acceptance of an abandonment.

44.3    This Insurer will pay all such sue and labor expenses subject to the limit of liability set forth elsewhere in this policy.

45.    DELAY:

This insurance is warranted free from, and shall not cover, loss of market or loss, damage or expense arising from delay, regardless of whether such delay is caused by a risk insured against or otherwise, unless such risks are expressly assumed elsewhere in this policy.

* * *

54.    PARTIAL LOSS:

54.1    In case of a covered partial loss to the goods and/or merchandise and/or property insured under this policy caused by risks insured against, the loss shall be determined by a separation of the damaged portion of the insured goods and/or merchandise and/or property from the sound and shall be the percentage of damaged portion as agreed by The Insured and This Insurer.

54.2    If no percentage is mutually agreed upon, then by public sale of the damaged portion for the account of The Insured and by comparison of the amount so realized with the market value of the damaged portion if it were in sound condition on the day of the sale.

54.3    At the option of The Insured, claims for insured goods and/or merchandise and/or property arriving at destination in a damaged condition may be settled on a "salvage adjustment" basis, with This Insurer paying the insured value of the damaged portion after taking credit for any salvage proceeds.

## UNDERLYING FACTS – THE INSURANCE CLAIM

32.     In mid-December 2013, Anheuser Busch InBev International shipped aboard the MSC MONTEREY (the "Vessel") various shipments of beer loaded in twelve non-temperature controlled containers loaded at Bremerhaven, Germany and destined for the Port of Baltimore.

33.     In mid-December 2013, AB InBev UK shipped aboard the MONTEREY various shipments of beer loaded in three non-temperature controlled containers loaded at Felixstowe, England and destined for the Ports of New York and Baltimore.

34.     In late December 2013, Anheuser-Busch InBev Belgium shipped aboard the MONTEREY various shipments of beer loaded in 143 non-temperature controlled containers loaded at Antwerp, Belgium and destined for the Ports of Boston, New York, Baltimore and Norfolk.

35.     All of the shipments of beer carried aboard the MONTEREY (the "Goods"), save one, were consigned to "Anheuser-Busch, Inc. Dba Import Brands Alliance" under the various sea waybills issued on behalf of the ocean carrier.

36.     All of the shipments of beer carried aboard the MONTEREY, save one, had been sold to "Anheuser-Busch, Inc. Dba Import Brands Alliance" on "DEQ Port of Entry" terms by Anheuser Busch InBev International and were ultimately destined under the invoices for numerous locations outside of the various ports, including locations in the State of New York.

37.     The references to "Anheuser-Busch, Inc. Dba Import Brands Alliance" on the sea waybills and in the invoices are intended to refer to Anheuser-Busch, LLC.

38.     The MONTEREY reportedly suffered a structural issue while en route to the United States that reportedly required the Vessel to call at port in Nova Scotia on December 31, 2013 for approximately fourteen days for repairs.

39.     Anheuser-Busch began having internal discussions no later than January 10, 2014 about "the containers at risk on the MSC Monterey that have been delayed in transit and exposed to below freezing temperatures for an extended period of time."

40.     Anheuser-Busch's insurance broker, Marsh, reported a "potentially substantial" claim to AGCS on January 13, 2014 "involving suspected freezing of beer" on the MONTEREY.

41.     AGCS acknowledged receipt of the potential claim on January 14, 2014 and asked, among other things, whether it could be confirmed that the beer had actually ever frozen.

42.     Marsh responded on January 15, 2014 and stated that Marsh did "not believe there is any evidence that the beer was frozen [because] the only support being that the vessel had been in sub-zero temps for longer than was anticipated."

43.     Marsh provided AGCS with a copy of Anheuser-Busch's proposed action plan on January 16, 2014.  The proposed plan, which was dated January 14, 2014, stated, in relevant part:

> Anheuser-Busch has closely examined the circumstances surrounding the MSC Monterey and our cargo on this vessel.  The vessel was berthed at the port of St. Mary's Bay, Nova Scotia for 13 days from December 31 through January 13, and the temperature while in port was never higher than 8° C and the product was exposed to below 0° C temperatures for approximately 6 days.  Therefore, it has been determined that all of the product (beer in kegs and bottles) on the vessel was frozen.
>
> * * *
>
> Confirmed evidence of freezing means you not only have conditions that allowed the freezing, but that you may have in fact frozen the whole amount. Our Zone Quality Assurance Team advises that without the presence of temperature trackers across an entire load, it must be assumed that the entire load was frozen to protect the quality of the product and the consumer experience.
>
> * * *
>
> Proposed action plan to determine product losses and minimize cost of claim.

- Anheuser-Busch recommends that a sample of containers from the MSC Monterey be inspected for product that is or was frozen.

- The details of the stowage locations for the containers on the vessel are available so that containers can be selected from multiple stow locations to ensure a meaningful cross sample is examined.

- Based on the findings from the sampled containers, it can be determined if all the containers on the vessel were impacted, or only containers stowed in specific areas of the vessel.

- All containers that remain at the port and are determined to be unsalable will then be returned under an Immediate Export to the shipper in Europe.

44.    The six containers bound for the Port of Boston were discharged from the MONTEREY at Boston on January 16, 2014.  Two of the containers were immediately delivered to Anheuser-Busch's facility in Merrimack, New Hampshire.  The Goods in those two containers were inspected by Anheuser-Busch's quality assurance department and provisionally released for distribution.  The remaining four containers were left at the port, stored outside in the open, until being delivered to the Merrimack facility on January 24, 2014 (the "Merrimack Goods").

45.    AGCS advised Marsh on January 17, 2014 that Anheuser-Busch's proposed action plan was reasonable for the time being and requested certain contact information so that AGCS could have the Goods inspected.  AGCS assigned CSL North America to inspect the Goods.

46.    The seventy-nine containers bound for the Port of New York were discharged from the MONTEREY at Newark, New Jersey on January 18, 2014.

47.    The forty-nine containers bound for the Port of Baltimore (the "Baltimore Goods") were discharged from the MONTEREY at Baltimore on January 22, 2014.   The

containers discharged at Baltimore were stored outside in the open at the port from January 22, 2014 through at least August 4, 2014.

48.     The twenty-four containers bound for the Port of Norfolk were not discharged at Norfolk but, instead, were discharged from the MONTEREY at Newark on or about January 25, 2014.

49.     In all, 103 containers were discharged at Newark (the "Newark Goods").   The containers discharged at Newark were stored outside in the open at the port from late January 2014 through at least August 4, 2014.

50.     All of the containers discharged at Boston, Newark and Baltimore cleared customs either before or after their arrival at their respective ports of entry.

51.     In accordance with Anheuser-Busch's action plan, six containers at Newark were selected for inspection and sample testing on February 11, 2014.   Five out of the six containers had been carried on deck on the Vessel.   A CSL surveyor attended the inspection on behalf of AGCS.   CSL understood that, based on the results of the inspection and sample testing of these six containers, a determination would be made by Anheuser-Busch as to the balance of the containers at Newark and Baltimore.

52.     The contents from the six Newark containers were unloaded, and CSL checked random cartons for signs of bloating or leaking bottles/cans and also looked for signs of frosting around beer keg nozzles.   CSL did not detect any signs of freezing or leaking bottles/cans. Samples were taken by Anheuser-Busch for laboratory analysis.

53.     Anheuser-Busch's quality assurance department advised CSL, among others, on February 18, 2014 that the six containers that had been inspected at Newark "can continue to their destination, and are approved for release."

54.     CSL reported to AGCS and Marsh on February 20, 2014 that CSL "would now assume that the remaining containers in New York (103 Total) and Baltimore (49 Total) would also be released for sale" and requested that Marsh "confirm that it would then bring a closure to this claim with no loss being incurred."

55.     Based on the February 18, 2014 advices from Anheuser-Busch's quality assurance department and CSL's report, AGCS sent an e-mail message to Marsh on February 24, 2014 asking whether AGCS could "move forward with file closure."

56.     AGCS reasonably believed as of February 24, 2014 that all of the Goods would proceed to distribution and that no claim would be made under the Policy.

57.     Anheuser-Busch sent an e-mail message to CSL on February 26, 2014 to which numerous photographs were attached that purported to show that the contents of the four containers delivered to Merrimack on January 24, 2014 had been damaged.

58.     CSL forwarded Anheuser-Busch's e-mail message of February 26, 2014 to AGCS on March 5, 2014.

59.     AGCS sent an e-mail message to Marsh on March 7, 2014 asking about Anheuser-Busch's e-mail message of February 26, 2014:

> Please see below.  I am not exactly sure what happened here, but the inspections in Boston and NYC revealed no signs of freezing.
>
> * * *
>
> I want to make sure we are all on the same page.  All of the containers we inspected, from different places in the stow, showed no signs of freezing.  Four of the six containers in Boston had already been sent on to the brewery on 1/28, but the remaining two containers we did inspect in Boston had no evidence of freezing.
>
> We have not heard anything from AB as to how they have decided to proceed, but AB still needs to prove freezing damage during transit, and that has not happened yet.  Rather, to the contrary.

> Will you please advise AB's position as to whether they wish to
> and ensure we are allowed to make any inspections or take as
> many samples as needed before any shipments are sent back. We
> will need a new point of contact for AB so we can get the ball
> rolling.

60.     Marsh responded on March 10, 2014 and stated that it had "also not heard from

AB and [was] asking them to advise their decided strategy for this product."

61.     Marsh advised AGCS on March 13, 2014 that Anheuser-Busch "has now advised

that they consider the entire shipment unsaleable due to freezing." At the same time, Marsh

forwarded what was reported to be a draft letter from Anheuser-Busch to AGCS that stated, in

relevant part:

> Per the procedures outlined and agreed to in our letter of January
> 14, 2014, Anheuser-Busch has examined containers in both
> Merrimack, NH and Newark, NJ and found confirmed evidence of
> freezing. As such, our Quality Assurance Team now advises that it
> must declare the entire load was frozen to protect the quality of our
> product and the consumer experience. This is consistent with
> Anheuser-Busch's approach to other situations involving frozen
> beer in the US being transported via OTR, Intermodal, and Rail.
>
> Although inspections showed mixed results, there is no way to
> guarantee that product was not frozen other than through
> destructive testing. As an example, in order to test our draught
> beer, we would have to break the seal on each keg which would
> make it not salable.
>
> As such, Anheuser-Busch will be refusing 100% of the containers
> on the MSC Monterey and return them to Western Europe for
> destruction. We are claiming a total loss with declared values of
> $2.7MM, plus other expenses including but not limited to
> demurrage, warehousing, and destruction. We believe it is more
> cost effective to return and dispose of product in Belgium
> (estimated costs of $440,000) versus doing here in the United
> States (estimated costs of $960,00).
>
> * * *
>
> Before proceeding with the return of our product to Western
> Europe, we would like your OK to move forward. In addition, we

would like your confirmation that our insurance policy will be
covering damages and expenses as outlined above.   We would like
your response no later than Friday, March 14.

62.     AGCS responded on March 13, 2014 that Anheuser-Busch's total loss claim came

"as quite a surprise, given that aside from the four containers in Merrimack, all the [Anheuser-

Busch quality assurance] reports and advises [*sic*] from our surveyor we have to date regarding

the containers at the ports and piers show no signs of freezing whatsoever."

63.     Based on the quality assurance sample testing carried out by Anheuser-Busch in

Newark and Merrimack that had found that the contents of the eight containers inspected were in

good condition, CSL reported to AGCS on March 14, 2014 that it had believed that many of the

other 150 containers would also be accepted.  CSL also reported that the containers discharged at

Boston, New York and Baltimore were stored in the open and that there was a possibility that the

Goods froze while in storage.

64.     AGCS sent a letter to Anheuser-Busch on March 21, 2014 reserving its rights

under the Policy and stating, in relevant part:

> At this juncture, we have a very difficult time in accepting the
> Assureds' contention that the cargo in all of the containers on board
> the "MSC Monterey" suffered freezing damage. Everything that
> we have seen to date indicates that, other than the four containers
> left on the pier in Boston and later sent to Merrimack, there was no
> evidence of freezing damage to beer in any other container.
>
> In this respect, pursuant to the Assured's "Action Plan" of January
> 14, 2014, utilizing the vessel's stowage plan, a representative
> sample of the remaining containers was selected by AB's Quality
> Assurance Team for thorough inspection and testing of their
> contents. According to the information which was provided to us,
> there was no evidence of the beer having frozen in any of those
> containers. Has anything changed?

65.     A surveyor from CSL attended the Merrimack facility on March 26, 2014 and

inspected the reportedly damaged Merrimack Goods from the four containers that had been

delivered to Merrimack on January 24, 2014. Certain of the Merrimack Goods had been set aside by Anheuser-Busch as "frozen," and the surveyor noted "what are generally accepted to be some of the residual signs/indications of the product having been subjected to freezing."

66. AGCS sent an e-mail message to Marsh on April 2, 2014 requesting that the remaining containers be opened and inspected for evidence of freezing. The request stated:

> As you are aware, we also have 8 containers surveyed by CSL and AB that showed absolutely no signs of freezing whatsoever and were released for distribution.
>
> We believe that all remaining containers in NY/NJ and Baltimore will need to be opened and inspected for evidence of freezing. Please advise who at AB should be contacted to arrange for same.

67. Marsh responded on April 4, 2014 to AGCS' request in an e-mail message stating, in relevant part:

> As promised, I did request AB's contact who would coordinate and attend with your surveyor at the opening and visual inspection of the containers at NY/NJ and Baltimore.
>
> Following my message to AB (John Fletcher) we were asked to discuss their position.
>
> Whilst acknowledging that Allianz's [AGCS] request is understandable given the "new" evidence that beer has been found that was frozen, AB cannot go the route of opening all of the containers. Much of the issue is based on costs, which would escalate significantly, and their internal quality control statutes (the latter have been articulated previously to an extent) preventing release of such product to market. Further, as the containers subject the letter have not yet cleared customs, access to have them opened would not at this point be feasible nor allowed. The containers would all have to be imported. Which would then attract customs duty, a significant loss if the product is not usable.
>
> We have worked with AB to develop what they requested which was their written formal response. Attached is their letter which sets out their stance in the matter

68.     Anheuser-Busch responded on April 4, 2014 to AGCS' request to open the remaining containers and inspect for evidence of freezing:

> We are in receipt of the survey report from Merrimack. As you have seen, we now have evidence of property damage resulting from freezing. As such, our Quality Assurance Policy requires destruction of product.
>
> Marsh has indicated that you would like us to inspect all remaining containers. Here are some additional points that we would like to discuss with you:
>
> 1)     The documented temperatures in Nova Scotia were well below freezing. (see attached temperature log)
>
> 2)     Stowage plan shows a total of 158 containers. Of these, 103 containers were above deck and 55 were below deck. The frozen beer from Merrimack was in containers above deck. Since all of the above deck containers were subjected to the same temperatures, and AB has discovered Kegs/Draught Beer and Bottled Beer that show visual evidence of freeze damage, we are precluded from releasing any of the above deck containers. It is also reasonable to assume all of those containers are damaged.
>
> 3)     Bear in mind our independent Wholesalers will not accept "beer suspected of being frozen" unless AB confirms that all of the beer is OK. We can't do this based on Anheuser-Busch's Quality Assurance Policy, plus the fact that we have now found frozen beer, unless every Keg is tested. The integrity of each keg can only be validated with 100% testing. This involves destructive testing due to the need to remove tamper-proof seals to collect samples. This leads to $CO_2$ loss, leakage and potential for mold growth due to valve gasket damage. 100% of the kegs will require inspection/valve replacement prior to their reuse. Since chill haze will also result due to exposure to below freezing temperatures additional testing must be conducted. This is very expensive.
>
> 4)     Costs associated with releasing the containers include Customs and duty charges, federal excise taxes, transportation to and storage at the facility for testing, the testing itself. The costs associated with destruction in the US, rather than Western Europe, is much higher. The

estimated charges have been determined to be approximately $960,000.00 in the United States vs. $500,000.00 by sending the beer back to Western Europe to be destroyed.

5) The Bills of Lading add additional complexity to this matter, as ABOVE DECK and BELOW DECK containers are manifested on the same bills of lading. No splitting of bills of lading is allowed and that would necessitate the release of above deck containers, which clearly were subjected to freezing temperatures, to be included in order to test the containers below deck, thus adding unnecessary costs to the claim.

6) As mentioned above, the overall costs element of the claim would further increase due to warehousing, labor, testing, etc. To be clear, visual evidence would not be sufficient. We would require LAB TESTING for all containers. I suspect that these further delays will also cause the product to be in danger of shelf life expiration.

7) Testing the product will add significant cost to the claim and bear in mind that there is little or no assurance at this point that the product below deck is acceptable for resale.

8) For your consideration is that AB's internal Quality Assurance Policy is very clear: that once damaged product is discovered in containers, all containers must be rejected.

9) Finally, please consider that with what we know it would be difficult for us to release beer to the marketplace which could expose AB to potential Brand reputational issues and potential third party actions.

69. On April 10, 2014, AGCS responded to Anheuser-Busch's letter of April 4, 2014

as follows:

As you know, we are perplexed by the abrupt turnaround that the Insured has taken with respect to this loss. And, at this point, we do not believe that the Insured is complying with its sue and labor obligations under the policy in light of its apparent refusal to take steps to minimize the insured loss.

More specifically, AB is not following its own action plan which was presented to us on January 14, 2014. That proposed action

plan to determine product losses and minimize cost of claim began by saying:

"Anheuser Busch recommends that a sample of the containers from the MSC Monterey be inspected for product that is or was frozen".

It goes on to state that:

"The details of the stowage location for the containers on the vessel are available so that containers can be selected from multiple stow locations to ensure a meaningful cross-sample is examined" . . . .

and then says:

"Based on the findings from the sampled containers it can be determined if all of the containers on the vessel were impacted or only the containers stowed in specific areas of the vessel." (emphasis supplied)

Toward this end, on February 11, 2014 AB's Quality Assurance team chose 6 containers in Port Newark for inspection and analysis pursuant to AB's action plan.  Although our surveyor was not given the stowage plan, he requested and understands that AB selected containers from various locations both above and below deck . . . along with a representative sample of containers with kegs, bottles and cans.

Inspection of the contents of all six containers by AB's Quality Assurance team, consisting of Natalie Johnson, Senior Quality Manager, and Scott Hvozdovic, Packaging Quality Assurance Manager, in accordance with the protocols set forth in AB's Action Plan did not detect any indication of freezing.  The AB team took samples which they indicated would be sent to their lab for further quality control analysis and on February 18, 2014 our surveyor was informed by email that the contents of these containers were "approved for release".

With respect to the six containers that had been previously discharged in Boston, our surveyor was informed that the first two containers delivered to AB's Merrimack NH facility were found to be in good condition and were released.  On February 26, 2014, our surveyor was told that the remaining four containers which had been left on the pier in Boston until at least January 24, 2014, showed evidence of having frozen.  When they were inspected

after arrival at Merrimack, NH, AB added that those four containers had been stowed "on deck" and "not near the engine".

To date, there has been no indication of damage to any of the other containers on board the vessel.  When, on March 13, 2014 you advised us that the Insured was now claiming total loss of all containers, we requested that further examination be done of the remaining containers.  In response, the Insured now contends in a letter dated April 4, 2014 that further inspection is not practical due to duty considerations.

Contrary to what the Insured has said, our surveyor has determined that all of the containers have been customs cleared and that inspection of a larger representative sample according to the stowage plan would not be at all difficult.

With this in mind, we kindly request that the Insured immediately provide a copy of the stowage plan which our surveyor has been requesting since the inception of the claim, and advise of a contact person at AB to coordinate further joint inspections and resume implementation of the Insured's action plan.

At this point in time, we must reserve all of our rights under the policy at law, or otherwise, and look forward to hearing from you promptly.

70.     AGCS and Anheuser-Busch agreed on April 16, 2014 that twenty additional containers at Newark would be selected for joint inspection and sample testing, with the containers being a combination of on deck and under deck from various locations on the Vessel. AGCS subsequently asked Anheuser-Busch if Anheuser-Busch also wanted to inspect/sample test containers discharged at Baltimore.  No containers at Baltimore were the subject of any joint inspection or sample testing.

71.     Stating that it understood Anheuser-Busch had made the decision to not distribute the Goods regardless of whether insurance coverage was available, AGCS advised Marsh on April 16, 2014 that Anheuser-Busch would have to demonstrate that the Goods are damaged in

order for AGCS to move forward with its investigation.   AGCS also requested certain information and documents.

72.   Marsh sent an e-mail message to AGCS on April 23, 2014 that stated, among other things:

> Please note A-B is asking about returning the remaining containers to Europe. In that respect I noted from the SANDY claims that A-B obtained approval from US Customs & Excise for a duty drawback for all damaged product, which enabled the damaged product to then be taken to their Parallel Products facility in Kentucky for disposal. I have advised A-B that this would seem to be the most cost-effective solution in this case but that I would seek your direction. I also advised A-B that you would probably wish to hold off moving the remaining containers until the further inspections (& testing) have been completed. Perhaps you would let me have your thoughts on that part of the project? A-B seems to think that it would be cheaper to send the containers back to Europe, and they are also suggesting that by doing so they may be able to escape paying storage charges to MSC, although I have no further detail at this point as to how that would work.

73.   AGCS sent an e-mail message to Marsh on May 1, 2014 seeking additional information and stating, among other things:

> We would strongly urge the insured to retain the additional containers.  If they choose to dispose of the cargo, then they would be precluded from additional testing in order to demonstrate damage to support their claim, if necessary.  We understand the insured will present a cost analysis between performing destruction in the US and overseas.

74.   Marsh responded the same day in an e-mail message that stated, among other things:

> On the issue of AB InBev's insistence that he containers be sent back to Europe for destruction, you will have seen the comments I provided in my message of April 23. I have asked AB InBev to provide their costing for shipping the containers back to Europe so that we can compare the cost against local US destruction as was undertaken on the "SANDY" claim.

75.     Marsh advised AGCS for the first time on May 6, 2014 of the amount of storage charges being incurred at Newark and Baltimore and that they amounted to nearly $3 million as of that date.  Later that day, Marsh sent another e-mail message to AGCS responding to several of AGCS' earlier requests for information and stating, among other things:

> The Insured, as we discussed, is very concerned over the accruing high level of storage charges, hence their wish to have the containers shifted back to Europe asap. Attached is their cost comparison between destruction in the US and shipping back to Europe, from which you will see that in fact the latter appears to be the less expensive option. Further, the Insured considers that they can negotiate a reduction in the storage charges in an effort to mitigate the loss if they opt to return the containers to Europe.

76.     Marsh sent an e-mail message to AGCS on May 13, 2014 that stated, among other things:

> Our understanding of the rationale behind the inspection of 20 containers was to take a representative sample of kegs bottles and cans, and that if, in each container, a reasonable amount of evidence of the units having been previously frozen was found, then such would be accepted as evidence that the container load was damaged.
>
> On the other hand, if there is only a few items in each container found to show signs of previous freezing, then it is expected that further random testing should be carried out. On the basis of the test results, can be determined that the container is damaged.
>
> This was we believe the proposal, designed to move forward as quickly as possible given the accruing storage charges.

77.     Anheuser-Busch asked AGCS on May 13, 2014 whether "the frozen beer that was already inspected at Merrimack" could be destroyed.  AGCS responded to Marsh on May 15, 2014 and stated that it could not authorize destruction but that it did not object to the destruction if Anheuser-Busch wished to dispose of the goods.

78.     A joint inspection of the twenty additional containers at Newark was held on May 14 and 15, 2014.  A surveyor from CSL and an outside consultant attended the inspection on behalf of AGCS.  CSL found no evidence of freezing in seventeen of the containers and a total of four physically damaged kegs in the three remaining containers.

79.     AGCS sent an e-mail message to Marsh on May 16, 2014 that shared AGCS' views on coverage and clarified that, in AGCS' "previous advice to the insured where we urged them to retain the containers, we clearly meant that the cargo within the containers should not be destroyed."  AGCS' message also stated:

> The purpose of the Sue and Labor clause is to encourage preservation or prevention of loss.  Having left the containers in open yards at the ports for the last 90 days or so may well have been detrimental to the cargo.  The storage charges, in our view, are not proper sue and labor costs, and should not be for AGCS' account.

80.     AGCS sent an e-mail message to Marsh on May 29, 2014 that stated, among other things:

> The inspection of the 20 containers in Newark revealed no signs of freezing damage, and noted that a total of four kegs showed leakage and were rejected.  I have attached the report for your review. AGCS agrees to pay for the four kegs with leakage, but on a without prejudice as to cause and will also pay for disposal of the 4 kegs, again on a without prejudice basis.
>
> We understand AB is conducting tests on the samples of beer pulled during these inspections and understand they should be completed shortly.  We also understand their findings will be presented to our expert for review and analysis.
>
> As to the disposal of the beer, we understand the beer that underwent inspection was loaded into containers and was to be disposed of at Parallel Products in Kentucky.  Is the plan for the containers remaining in the ports to be returned back to Europe and the containers at the brewery to be disposed of domestically?  At any rate, it is the insured's cargo, and if they want to ship it anywhere for disposal, they can choose to do so.  We have found

no covered damage to date, so any costs to dispose of the containers and their contents will be at the insured's expense. If there is a finding of damage, AGCS will only pay reasonable costs of disposal.   For example, if damage is shown and the insured chooses to dispose of the beer in Europe, but disposal in the US is more cost effective, AGCS will only pay for the cost of disposal in the US.

Further, AB should understand that disposing of the cargo will prevent them from performing additional inspections (at their own expense).

81.     On June 6, 2014, Anheuser-Busch provided AGCS with the results of its testing of the samples taken from the twenty containers at Newark in May 2014.  The results showed that:

- The Newark Goods from six of the containers did not show any evidence of freezing based on laboratory analysis, visual inspection or taste profile.

- The Newark Goods from seven of the containers were rejected by Anheuser-Busch, at least in part, because the contents are believed by Anheuser-Busch to be out of taste specification profile.

- The Newark Goods from four of the containers were rejected by Anheuser-Busch based on visual evidence alone (*i.e.*, showed physical indications of damage).

- The Newark Goods from three of the containers were rejected by Anheuser-Busch based on turbidity (clarity) alone.

82.     Anheuser-Busch had reported earlier that the Merrimack Goods from four of the six containers at Merrimack reportedly showed visual signs of physical damage.  Anheuser-Busch reported at the same time that the remaining two containers "did not show any visual signs of physical damage, but were held and determined to be non-salable."

83.     On June 12, 2014, AGCS forwarded to Marsh the questions that AGCS' outside consultant had about Anheuser-Busch's test results.  At the same time, AGCS advised Marsh that

Anheuser-Busch's decision to continue to retain the containers at the ports was Anheuser-Busch's decision alone and that AGCS does not consider the storage, demurrage and other related expenses to be covered under the Policy.

84.     AGCS' outside consultant issued a report on June 24, 2014 in which he opines that Anheuser-Busch's test results do not indicate that the tested Newark Goods suffered damage due to freezing.  The consultant is of the opinion that the results are indicative of either the natural aging of the beer or the beer being subjected to fluctuations in temperature.  A copy of the consultant's report was provided to Marsh on June 25, 2014.

85.     AGCS sent a letter to Marsh on July 2, 2014 that advised, among other things, that AGCS does not believe that Anheuser-Busch has demonstrated the claimed freezing damage and that the claimed storage charges are not covered under the Policy.

86.     Anheuser-Busch responded on September 2, 2014 to AGCS' letter of July 2, 2014. The response states, among other things:

- Based upon clear evidence that the MSC Monterey had been subjected to conditions necessary to freeze product and frozen product was found, Anheuser-Busch rejected all product per our Quality Assurance Policy.

* * *

- We cannot and will not release product that compromises the quality, appearance, and consumer experience for our product.  Beer characterized as out of profile, or off flavor, is unacceptable.

* * *

**Storage Charges**

1)     Anheuser-Busch rejected these containers of frozen/damaged beer per our quality assurance policy and deemed the product as non-salable

* * *

> 5)   We are holding Allianz responsible for all storage charges incurred while we were waiting for your authorization to return product to Western Europe. Documentation reflecting those storage charges are enclosed.

87.   Anheuser-Busch is claiming under the Policy for the alleged total loss of the Goods in the approximate amount of $2.7 million. The claim is based on the physical loss of or damage to some, but not all, of the Goods. Anheuser-Busch asserts that Clause 28 of the Policy gives it the "absolute right" to determine whether the Goods have been damaged and the "absolute discretion" to determine that the Goods are "not satisfactory and to dispose of [them]." AGCS disagrees with Anheuser-Busch's reading of Clause 28.

88.   Anheuser-Busch is also claiming under the Policy for the approximately $9 million in late penalties and/or demurrage charges and/or storage charges that it purportedly incurred to retain containers and to store the Newark Goods and the Baltimore Goods.

89.   AGCS has fully investigated Anheuser-Busch's claim, including engaging an outside surveyor and an outside consultant. By and through this declaratory judgment action, and based on that investigation, AGCS hereby declines coverage under the Policy for the claimed loss.

## AS AND FOR A FIRST CAUSE OF ACTION

90.   AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "89" of this Complaint with the same force and effect as if more fully set forth herein.

91.   Clause 17.1.1 of the Policy provides that the "insurance attaches from the time the goods . . . leave the warehouse . . . at the place named in the policy . . . for the commencement of the transit and continues until the goods . . . are delivered to the final warehouse . . . at the destination named in the policy . . . ."

92.     Clause 19 of the Policy provides that the

> insurance is extended to cover, subject to the applicable insuring
> terms, conditions and warranties set forth elsewhere in this policy,
> goods and/or merchandise and/or property intended for shipment
> (i) during the loading process prior to dispatch (including, into
> containers, trailers and rail cars) and continuing thereafter while
> they await the commencement of the transit and (ii) after they
> arrive at the final destination, and continuing thereafter, until they
> are promptly unloaded (including, from containers, trailers and rail
> cars) and throughout the unloading process.

93.     Clause 22 of the Policy provides that the "insurance is extended to cover goods . . . insured under this policy whenever same are stopped in transit, anywhere in the world, short of final destination, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy."

94.     The foregoing provisions, among others, indicate that the intent of the Policy is to cover insured goods while they are in transit (*i.e.*, the time when the goods are being transported).  The Policy is concerned with such perils as might occur between the time the goods are shipped by Anheuser-Busch and the time they are received at the final destination, with the insurance extended to cover the unloading process if the goods are promptly unloaded.

95.     The Newark Goods and the Baltimore Goods were originally destined for a number of locations outside the Ports of New York and Baltimore.  However, due to the alleged freezing damage, Anheuser-Busch decided sometime before March 13, 2014 to terminate the transit of the Newark Goods at the Port of New York and to terminate the transit of the Baltimore Goods at the Port of Baltimore.

96.     The Baltimore Goods and the vast majority of the Newark Goods were never unloaded but, instead, were stored from January 2014 through at least August 4, 2014 at the

Ports of Baltimore and New York, respectively, in the containers in which they had been shipped.

97.     Based on the foregoing, AGCS is entitled to a judgment declaring that the Policy does not cover any loss of or damage to the Newark Goods or the Baltimore Goods after transit terminated at the Ports of New York and Baltimore sometime before March 13, 2014.

## AS AND FOR A SECOND CAUSE OF ACTION

98.     AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "97" of this Complaint with the same force and effect as if more fully set forth herein.

99.     Clause 16.1 of the Policy provides that insured goods are insured "[a]gainst all risks of physical loss or damage from any external cause . . . ."

100.    Clause 54.1 of the Policy provides that, "[i]n case of a covered partial loss to the goods . . . insured under this policy caused by risks insured against, the loss shall be determined by a separation of the damaged portion of the insured goods . . . from the sound and shall be the percentage of damaged portion as agreed by The Insured and This Insurer."

101.    Under the foregoing provisions, AGCS is liable under the Policy only for those Goods that Anheuser-Busch can demonstrate were physically lost or damaged from an external cause.

102.    Anheuser-Busch does not claim that all of the Goods were physically lost or damaged.

103.    Anheuser-Busch has not demonstrated that all of the Goods were physically lost or damaged from an external cause.

104.    Anheuser-Busch has not completely segregated the damaged portion of the Goods from the sound portion of the Goods.

105.    Based on the foregoing, AGCS is entitled to a judgment declaring that AGCS is not liable under the Policy for those Goods that Anheuser-Busch has not demonstrated were physically lost or damaged from an external cause and further declaring that Anheuser-Busch must segregate the damaged portion of the Goods from the sound portion of the Goods.

## AS AND FOR A THIRD CAUSE OF ACTION

106.    AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "105" of this Complaint with the same force and effect as if more fully set forth herein.

107.    Clause 28 of the Policy, the Control of Damaged Goods and/or Merchandise and/or Property ("CDG") clause, provides, in relevant part:

> 28.1    Notwithstanding anything to the contrary (including the Brands and Trademarks Clause and the Labels Clause) contained elsewhere in this policy, it is understood and agreed that in case of damage to goods and/or merchandise and/or property insured under this policy, The Insured is to retain full and absolute discretion and control over the disposition of all such goods and/or merchandise and/or property. It is understood that The Insured shall be the sole judge as to whether disposal or sale of such goods and/or merchandise and/or property is detrimental to its interest.

108.    Clause 16.1 provides that insured goods are insured "[a]gainst all risks of physical loss or damage from any external cause . . . ."

109.    Under the foregoing provisions, the CDG clause is only triggered by physical loss or damage from an external cause and only gives Anheuser-Busch discretion and control over the disposition of goods that were physically lost or damaged.  Similarly, the second sentence of Clause 28.1 only applies to goods that were physically lost or damaged.

110.    Based on the foregoing, AGCS is entitled to a judgment declaring that the CDG clause does not apply to Goods that were not physically lost or damaged.

### AS AND FOR A FOURTH CAUSE OF ACTION

111.    AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "110" of this Complaint with the same force and effect as if more fully set forth herein.

112.    Clause 16.1 provides that insured goods are insured "[a]gainst all risks of physical loss or damage from any external cause except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty and/or other warranties or exclusions specified in this policy unless covered elsewhere herein . . . ."

113.    Clause 45 of the Policy provides that the "insurance is warranted free from, and shall not cover, loss of market or loss, damage or expense arising from delay, regardless of whether such delay is caused by a risk insured against or otherwise, unless such risks are expressly assumed elsewhere in this policy."

114.    Clause 45 excludes any claim by Anheuser-Busch that is for Goods that were not physically lost or damaged but were nonetheless rejected by Anheuser-Busch because the undamaged Goods are purportedly non-salable because they do not meet Anheuser-Busch's quality assurance standards.

115.    Based on the foregoing, AGCS is entitled to a judgment declaring that AGCS is not liable under the Policy for Goods that were not physically lost or damaged but were rejected by Anheuser-Busch because the undamaged Goods are non-salable because they do not meet Anheuser-Busch's quality assurance standards.

### AS AND FOR A FIFTH CAUSE OF ACTION

116.    AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "115" of this Complaint with the same force and effect as if more fully set forth herein.

117.    Clause 44.1 of the Policy provides that, "[i]n the case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for The Insured . . . to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods . . . insured hereunder, or any part thereof . . . ."

118.    Anheuser-Busch refused or failed to inspect or test the vast majority of the Goods to determine whether the Goods had actually suffered damage due to freezing.

119.    Because the basis of Anheuser-Busch's claim is that the Goods suffered damage due to freezing, Anheuser-Busch knew or should have known that exposing the Goods to freezing temperatures may lead to damage.

120.    Anheuser-Busch also knew or should have known that exposing the Goods to temperatures fluctuations may lead to damage.

121.    Anheuser-Busch stored four of the non-temperature controlled containers discharged at the Port of Boston in an uncontrolled environment from the time the containers were discharged on January 16, 2014 until the time the containers were unloaded at Merrimack sometime on or after January 24, 2014.

122.    Anheuser-Busch stored the Newark Goods and the Baltimore Goods from January 2014 through at least August 4, 2014 in non-temperature controlled containers that were kept in an uncontrolled environment.

123.    The manner in which Anheuser-Busch handled and stored the containers subjected the Goods to freezing temperatures and/or temperature fluctuations and thereby exposed the Goods to damage.

124.    Based on the foregoing, Anheuser-Busch breached its obligations under Clause 44.1.

125. Therefore, AGCS is entitled to a judgment declaring that AGCS is not liable under the Policy to the extent Anheuser-Busch's breach of Clause 44.1 increased or failed to reduce Anheuser-Busch's loss.

**AS AND FOR A SIXTH CAUSE OF ACTION**

126. AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "125" of this Complaint with the same force and effect as if more fully set forth herein.

127. The storage of the Newark Goods and the Baltimore Goods from January 2014 through at least August 4, 2014 in non-temperature controlled containers that were kept in an uncontrolled environment did not act to safeguard the Newark Goods or the Baltimore Goods and, in fact, exposed the Newark Goods and the Baltimore Goods to damage.

128. In the alternative, if all of the Newark Goods and the Baltimore Goods were found or considered by Anheuser-Busch to be damaged upon arrival as Anheuser-Busch alleges, then there was no need to safeguard the Newark Goods or the Baltimore Goods.

129. Based on the foregoing, the containers that Anheuser-Busch retained to store the Newark Goods and the Baltimore Goods either did not safeguard the Newark Goods and the Baltimore Goods or were not needed to safeguard the Newark Goods and the Baltimore Goods.

130. Therefore, AGCS is entitled to a judgment declaring that any late penalties and/or demurrage charges and/or storage charges for the retaining of any containers and for the storing of the Newark Goods and the Baltimore Goods are not recoverable as sue and labor expenses under Clause 44.1.

**AS AND FOR A SEVENTH CAUSE OF ACTION**

131. AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "130" of this Complaint with the same force and effect as if more fully set forth herein.

132.   Clause 36 of the Policy provides that, "[i]f The Insured is directed by This Insurer to retain a container, trailer or rail car and if The Insured is assessed a late penalty and/or demurrage charge for the holding of the container, trailer or rail car past the return date, This Insurer will pay late penalties and demurrage charges."

133.   AGCS never directed Anheuser-Busch to retain any containers.

134.   Anheuser-Busch led AGCS to believe through at least March 13, 2014 that the Goods were not damaged and that a claim would not be made under the Policy.   AGCS, therefore, had no reason to direct Anheuser-Busch to retain any containers before that date.

135.   To the extent Anheuser-Busch interpreted a communication from AGCS after March 13, 2014 as a direction to retain containers, such interpretation was erroneous.   In any event, Anheuser-Busch objected to retaining all of the containers.

136.   AGCS and Anheuser-Busch agreed on April 16, 2014 that the contents of twenty containers at Newark would be unloaded for joint inspection and sample testing.

137.   AGCS clarified no later than May 16, 2014 that Anheuser-Busch only needed to retain the Goods themselves and not any containers.   Thus, Anheuser-Busch had no reason to believe that any containers needed to be retained after May 16, 2014.

138.   To the extent Anheuser-Busch retained any containers and stored the Goods, it was for the purposes of demonstrating a covered claim under the Policy and, as such, the costs to retain the containers and to store the Goods are solely for Anheuser-Busch's account.

139.   Based on the foregoing, AGCS is entitled to a judgment declaring that AGCS is not liable under the Policy for any late penalties and/or demurrage charges and/or storage charges for the retaining of any containers and for the storing of the Newark Goods and the Baltimore Goods.

140.   In the alternative, AGCS is entitled to a judgment declaring that AGCS is only liable for late penalties and/or demurrage charges and/or storage charges incurred for the retaining of the twenty containers at Newark between April 16, 2014 and May 16, 2014 for joint inspection and sample testing.

## AS AND FOR A EIGHTH CAUSE OF ACTION

141.   AGCS repeats and realleges each and every allegation set forth in paragraphs "1" through "140" of this Complaint with the same force and effect as if more fully set forth herein.

142.   Anheuser-Busch had an obligation to act as a prudent uninsured.  This required Anheuser-Busch to, among other things, minimize its losses.

143.   Anheuser-Busch refused or failed to inspect or test the vast majority of the Goods to determine whether the Goods had actually suffered damage due to freezing.

144.   The manner in which Anheuser-Busch handled and stored the containers at the Ports of Boston, New York and Baltimore subjected the Goods to freezing temperatures and/or temperature fluctuations and thereby exposed the Goods to damage.

145.   Anheuser-Busch unreasonably incurred excessive late penalties and/or demurrage charges and/or storage charges to retain containers and to store the Newark Goods and the Baltimore Goods.  Actions that Anheuser-Busch could have taken to avoid some or all of the late penalties and/or demurrage charges and/or storage charges, thereby minimizing Anheuser-Busch's damages, include, but are not limited to:

a)   Anheuser-Busch has a facility in Newark outside of the port, and the Newark Goods could have been moved there, as was done with the Goods discharged at the Port of Boston;

b)      as Anheuser-Busch itself proposed, the Newark Goods and the Baltimore Goods could have been timely returned to their points of origin; or

c)      as Anheuser-Busch's broker proposed, the Newark Goods and the Baltimore Goods could have been timely moved to locations outside of the various ports for handling.

146.    Assuming, *arguendo*, AGCS had directed Anheuser-Busch to retain some or all of the containers, Anheuser-Busch acted unreasonably by failing to timely advise AGCS of the excessive late penalties and/or demurrage charges and/or storage charges that were being incurred to retain containers and to store the Newark Goods and the Baltimore Goods.

147.    Anheuser-Busch otherwise failed to take the necessary and reasonable actions that were available to it to minimize its loss.

148.    Based on the foregoing, Anheuser-Busch did not act as a prudent uninsured and otherwise failed to mitigate its damages.

149.    Therefore, AGCS is entitled to a judgment declaring that AGCS is not liable under the Policy to the extent Anheuser-Busch did not act as a prudent uninsured or otherwise failed to mitigate its damages.

**WHEREFORE**, Plaintiff AGCS Marine Insurance Company prays as follows:

A.      For judgment on the FIRST CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that the Policy does not cover any loss of or damage to the Newark Goods or the Baltimore Goods after transit terminated at the Ports of New York and Baltimore sometime before March 13, 2014;

B.      For judgment on the SECOND CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that AGCS is not liable under the

Policy for those Goods that Defendants have not demonstrated were physically lost or damaged from an external cause and further declaring that Defendants must segregate the damaged portion of the Goods from the sound portion of the Goods;

      C.     For judgment on the THIRD CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that Clause 28 of the Policy does not apply to Goods that were not physically lost or damaged;

      D.     For judgment on the FOURTH CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that AGCS is not liable under the Policy for Goods that were not physically lost or damaged but were rejected by Defendants because the undamaged Goods are non-salable because they do not meet Defendants' quality assurance standards;

      E.     For judgment on the FIFTH CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that AGCS is not liable under the Policy to the extent Defendants' breach of Clause 44.1 of the Policy increased or failed to reduce Defendants' loss;

      F.     For judgment on the SIXTH CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that any late penalties and/or demurrage charges and/or storage charges for the retaining of any containers and for the storing of the Newark Goods and the Baltimore Goods are not recoverable as sue and labor expenses under Clause 44.1;

      G.     For judgment on the SEVENTH CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that AGCS is not liable under the Policy for any late penalties and/or demurrage charges and/or storage charges for the retaining of

any containers and for the storing of the Newark Goods and the Baltimore Goods or, in the alternative, declaring that AGCS is only liable for late penalties and/or demurrage charges and/or storage charges incurred for the retaining of the twenty containers at Newark between April 16, 2014 and May 16, 2014 for joint inspection and sample testing;

H.      For judgment on the EIGHTH CAUSE OF ACTION in favor of Plaintiff AGCS Marine Insurance Company and against Defendants declaring that Defendants did not act as a prudent uninsured and otherwise failed to mitigate their damages and further declaring that AGCS is not liable under the Policy to the extent Defendants did not act as a prudent uninsured or otherwise failed to mitigate their damages; and

I.      For such other and further relief as the Court deems just and proper under the circumstances, together with the costs and disbursements of this action.

Dated: New York, New York
       September 15, 2014

NICOLETTI HORNIG & SWEENEY
*Attorneys for Plaintiff*

By: _____
       John A.V. Nicoletti
       Wall Street Plaza
       88 Pine Street, Seventh Floor
       New York, New York 10005
       (212) 220-3830

# EXHIBIT

# "1"

THE INSURANCE COMPANY SIGNATORY HERETO
(HEREINAFTER REFERRED TO AS "THIS INSURER")
BY THIS POLICY OF MARINE INSURANCE,
FOR THE CONSIDERATION SET FORTH HEREIN,
DOES INSURE


**Anheuser-Busch InBev**


and its Subsidiary, Associated, Affiliated and
Interrelated Companies, and Joint Ventures in
which it has now or hereafter may have a direct or indirect insurable
interest and other entities for whom they, or any of them, may have
instructions to insure or deem themselves responsible to insure
(HEREINAFTER REFERRED TO AS "THE INSURED")


FOR THE RESPECTIVE INTERESTS SET FORTH ELSEWHERE IN THIS POLICY.

# TABLE OF CONTENTS

| Caption | Clause No. |
|---|---|
| Accumulation | 14 |
| Application of Warehouse to Warehouse and Marine Extension | 18 |
| Attachment and Cancellation | 4 |
| Both to Blame | 21 |
| Brands and Trademarks | 25 |
| Captions | 62 |
| Carrier or Bailee | 46 |
| Concealed Damage | 30 |
| Conditions of Coverage | 16 |
| Constructive Total Loss | 55 |
| Contingent Interest/Unpaid Vendors | 42 |
| Control of Damaged Goods and/or Merchandise and/or Property | 28 |
| Conveyances | 5 |
| Craft, Etc. | 6 |
| Debris Removal | 33 |
| Declaration of Interest Insured | 10 |
| Deductible | 13 |
| Delay | 45 |
| Demurrage Charges | 36 |
| Difference in Conditions | 41 |
| Duty, Taxes, Etc. | 15 |
| Errors and Omissions | 11 |
| Expediting Cost | 38 |
| FOB, FAS, CFR Shipments | 40 |
| Fraudulent Bills of Lading | 35 |
| General Average | 31 |
| Geographical Limits | 7 |
| Governmental Damage | 23 |
| Deliberate Damage - Pollution Hazard | 23.1 |
| Deliberate Damage – Services | 23.2 |
| Guarantee of Collectibility | 43 |
| Increased Values and/or Profits | 34 |
| Insufficiency of Packing | 32 |
| Insurable Interest | 51 |

## TABLE OF CONTENTS
### (Continued)

| Caption | Clause No. |
|---|---|
| Interest Insured | 3 |
| Interruption of Transit | 22 |
| Labels | 26 |
| Landing, Warehousing | 37 |
| Letter of Credit | 49 |
| Limits of Liability | 12 |
| Loading/Unloading | 19 |
| Loss Payee | 2 |
| Machinery | 24 |
| Negligence | 48 |
| Notice of Loss | 53 |
| Other Insurance | 56 |
| Pair and Sets | 27 |
| Paramount Warranties | 47 |
|    F.C. & S. Warranty | 47.1 |
|    S.R. & C.C. Warranty | 47.2 |
|    Nuclear Exclusion | 47.3 |
| Partial Loss | 54 |
| Payment of Loss | 57 |
| Payment on Account | 58 |
| Policy Number | 65 |
| Precedence of Conditions | 61 |
| Premium | 8 |
| Protection of Suit Time | 52 |
| Recoopering/Repacking | 20 |
| Refused or Returned Shipment | 39 |
| Required by Law | 64 |
| Shortage of Contents | 29 |
| Signature of This Insurer | 66 |
| Subrogation | 59 |
| Substitution | 60 |
| Sue and Labor | 44 |
| Suit Against Insurer | 63 |
| The Insured | 1 |
| Valuation | 9 |
| Waiver and/or Release | 50 |
| Warehouse to Warehouse and Marine Extension | 17 |

1.   <u>THE INSURED:</u>

**Anheuser-Busch InBev** and its subsidiary, associated, affiliated and interrelated companies, and joint ventures in which it now has or hereafter may have a direct or indirect insurable interest and other entities for whom they may have instructions to insure or deem themselves responsible to insure, as their respective interests may appear (hereinafter referred to as "The Insured").

2.   <u>LOSS PAYEE:</u>

PROCEEDS, IF ANY, PAYABLE TO THE INSURED OR ORDER.

3.   <u>INTEREST INSURED:</u>

3.1   The interests insured under this policy are (i) goods and/or merchandise and/or property of every description whether new or used, including bulk goods, consisting principally of, but not limited to **beer, hops, barley, gift items, rice, novelties, automobiles and household goods and personal effects of employees** and including prepaid freight, advanced freight, guaranteed freight and freight payable "vessel lost or not lost," under or on deck, shipped by or consigned to The Insured, its agents or others, (ii) The Insured's own goods and/or merchandise and/or property, and (iii) goods and/or merchandise and/or property of others in which The Insured may have an interest.

3.2   Also to cover all shipments of goods and/or merchandise and/or property made for the account of others which The Insured agrees or receives instructions to insure.

4.   <u>ATTACHMENT AND CANCELLATION:</u>

This policy is continuous and covers all shipments of goods and/or merchandise and/or property made on and after 12:01 a.m. local standard time **May 1, 2010** at the place shipment commences and on all goods and/or merchandise and/or property in storage at locations insured under this policy on and after said time and date at the place of storage unless canceled by either party on written, telecopied or telegraphic notice received by the other party at least ninety (90) days before the cancellation date. Such cancellation, however, is not to prejudice any coverage which had attached prior to the cancellation date designated in such notice except that coverage on goods and/or merchandise and/or property in storage at locations insured hereunder shall terminate on the designated cancellation date, provided proper notice has been given.

5.   <u>CONVEYANCES:</u>

5.1   This policy covers all shipments made by vessel, barge, truck, railcar and/or land and/or air conveyance and all connecting conveyances including shipments by mail and parcel post, messengers, parcel delivery service and couriers.

5.2   Wherever the words "ship," "vessel," "seaworthiness," "shipowner," or "vessel owner" appear in this policy, they are deemed to include also the words "aircraft," "airworthiness," and "aircraft owner."

6.    CRAFT, ETC.:

    6.1    Coverage under this policy includes the risk by craft, raft and/or lighter to and from the vessel. Each craft, raft and/or lighter to be deemed separately insured. Also to cover any special or supplementary lighterage to take the goods and/or merchandise and/or property to and from the warehouse.

    6.2    The Insured is not to be prejudiced by any agreement exempting lightermen from liability.

7.    GEOGRAPHICAL LIMITS:

This policy covers all shipments, except to the extent coverage is prohibited by United States of America law or United States of America governmental decree, at and from ports and/or places in the world to and at ports and/or places in the world directly or via ports and/or places in any order, including the risk of transshipment by land, air, water, or otherwise. This policy excludes shipments originating and terminating within any one country, except for China, where a separate inland transit policy is in force

8.    PREMIUM:

The consideration for all of the coverages provided in this policy, including contingent and extended coverages, unless otherwise agreed, is the premium payable for the primary coverage, as agreed.

9.    VALUATION:

    9.1    Unless specifically provided for elsewhere in this policy, or instructions to the contrary are given or received by The Insured, the goods and/or merchandise and/or property insured under this policy shall be valued at the total amount of the invoice issued to the consignee of the insured shipment (including all charges invoiced therein), plus all charges not included in such invoice, including any prepaid or advanced or guaranteed freight, if any, plus 10% until declared and then at the amount declared, provided such declaration is made prior to any known or reported loss or accident, but in no event to be less than the foregoing.

    9.2    Privilege is granted to The Insured to insure in foreign currencies. When the privilege is exercised, the proceeds paid under this policy are payable in the same currencies, however, at the option of the Insured, the proceeds are payable in United States dollars at the rate of exchange current on the date the above invoice was issued as published in the Dow Jones Foreign Exchange Rates.

    9.3    Household goods and personal effects are valued at amount declared by the Insured as evidenced by an itemized valued inventory submitted at the time of shipment or before any known or reported loss.

9.4      Insured goods and/ or merchandise and/or property shipped free of charge, or for an amount not reflective of their actual value, to or from The Insured shall be valued at replacement cost new, whether or not actually replaced.

9.5      Used goods, merchandise and machinery insured under this policy shall be valued at the actual cost to The Insured to replace same with an item of like kind and quality, but if not replaced, then (i) at the actual cash value of the item as determined by an independent surveyor appointed by The Insured or (ii) at the book value of the item as maintained in the accounting records of The Insured, whichever is higher.

10.     DECLARATION OF INTEREST INSURED:

10.1      Unless otherwise specifically agreed, it is a condition of this policy that The Insured shall declare to Marsh Inc., as brokers for The Insured, for transmission to This Insurer, as soon as practicable, copies of all certificates, special policies, declarations and endorsements for each and every shipment coming within the terms of this policy, whether arrived or not.

10.2      Authority is hereby given The Insured to issue and countersign This Insurer's certificates and special policies (including endorsements thereto) on any and all shipments insured under this policy, but only subject to the terms, conditions and warranties of this policy, it being understood and agreed that all certificates and special policies and endorsements must be countersigned by a duly authorized representative of The Insured in order to become binding on This Insurer. Shipments on which certificates or special policies are not required may be reported by special declaration forms furnished to The Insured.

10.3      Nothing in this Clause shall be deemed to require The Insured to declare to This Insurer shipments covered under the following clauses found elsewhere in this policy: (i) FOB, FAS, CFR Shipments, (ii) Difference in Conditions, (iii) Contingent Interest/Unpaid Vendors or (iv) Guarantee of Collectability.

11.     ERRORS AND OMISSIONS:

This policy shall not be vitiated by any unintentional delay, error, omission or oversight in making any declaration that is required to be made under any provision contained in or endorsed on this policy provided a correct declaration is communicated to This Insurer as soon as practicable after the delay, error, omission or oversight becomes known to The Insured's corporate risk manager or equivalent, and premium paid, if required by This Insurer.

12.     LIMITS OF LIABILITY:

12.1      Unless otherwise agreed, This Insurer shall not be liable under this policy for more than **$15,000,000** per any conveyance, connecting conveyance, craft or at any place at anytime; except **$3,000,000 per inland truck, tractor, barge or international rail; $3,000,000 any one package, shipped by mail or parcel post ; $3,000,000 any one shipment of household goods and/or personal effects**

12.2   If the total value at risk exceeds the limit of liability set forth in Sub-Clause 12.1, the principle of co-insurance is waived by This Insurer.

12.3   Nothing in Sub-Clause 12.2 shall be construed to amend the limit of liability set forth in Sub-Clause 12.1.

12.4   This Insurer shall pay in full claims for general average, salvage and special charges and for such expenses as are provided for in the Sue and Labor clause even though the sum insured may be less than the contributing value or actual value of the goods and/or merchandise and/or property insured under this policy.

12.5   The limit of liability of This Insurer with respect to the coverages provided for in the General Average, Landing and Warehousing and Duties, Taxes, Etc. clauses shall each be separate from, and equal in amount and in addition to, the limit of liability set forth in Sub-Clause 12.1 and shall be separate from and in addition to any other limit(s) of liability set forth in this policy.

12.6   The limit of liability of This Insurer with respect to the coverage provided for in the Sue and Labor clause shall be separate from, and equal in amount and in addition to, the limit of liability set forth in Sub-Clause 12.1 and shall be separate from and in addition to any other limit(s) of liability set forth in this policy.

12.7   The limit of liability of This Insurer with respect to the coverage provided for in the Debris Removal clause shall be separate from and in addition to, the limit of liability set forth in Sub-Clause 12.1 and shall be separate from and in addition to any other limit(s) of liability set forth in this policy.

13.   **DEDUCTIBLE:**

13.1   A deductible of **$2,500** shall apply to any one Loss; however, this deductible shall not apply general average, salvage or special charges; except for hops, barley, rice and other grains shipped in bulk where the normal trade loss of one half of one percent (1/2 of 1%) would apply.

13.2   The deductible shall not be applied so as to reduce This Insurer's obligation to pay the full amount of any limit(s) of liability set forth in this policy.

14.   **ACCUMULATION CLAUSE:**

Should there be an accumulation of the interests insured hereunder beyond the limit(s) of liability expressed elsewhere in this policy by reason of any interruption of transit or circumstance beyond the control of The Insured's corporate risk manager or equivalent, or by reason of any casualty, or at a transshipping point, or on a connecting conveyance, This Insurer shall, provided notice of such accumulation is given to This Insurer as soon as practicable after it becomes known to The Insured's corporate risk manager or equivalent, hold covered such excess interest and shall be liable for the full amount at risk, but in no event shall This Insurer's liability exceed twice the limit of liability set forth in Sub-Clause 12.1.

15.  **DUTY, TAXES, ETC.:**

15.1  In addition to the limit(s) of liability set forth elsewhere in this policy, This Insurer agrees to pay duties, value added taxes (V.A.T.) and other like charges paid by or which become due from The Insured with respect to shipments for which a claim is paid by This Insurer.

15.2  The Insured will, in all cases, use reasonable efforts to obtain abatement or refund of duties and other charges paid or claimed in respect of goods lost, damaged or destroyed.

15.3  This insurance on duty, V.A.T. and other charges shall terminate at the end of the import movement covered under this policy (including the Warehouse to Warehouse and Marine Extension and the Loading/Unloading clauses) but nothing contained in this Clause shall alter or affect any coverage granted elsewhere in this policy during the storage or transit subsequent thereto.

16.  **CONDITIONS OF COVERAGE:**

16.1  All goods and/or merchandise and/or property, except those listed in Sub-Clause 16.2.6, are insured:

Against all risks of physical loss or damage from any external cause, except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty and/or other warranties or exclusions specified in this policy unless covered elsewhere herein, irrespective of percentage.

16.1.2  Household Goods and Personal Effects of Company Employees:

It is understood and agreed that goods and/or merchandise consisting of the household goods and personal effects of employees are insured against All Risks of Physical Loss and/or Damage from any external cause whatsoever (excluding those risks excepted by the F.C. & S. and S.R. & C.C. Warranties) irrespective of percentage but excluding gradual deterioration, moths, vermin, and inherent vice.

It is further understood and agreed that the following warranties must be met for coverage to apply:

A)  Goods are to be professionally packed and a valued inventory must be submitted to Underwriters on all items valued in excess of $500.

B)  A recent appraisal within 5 years prior to shipment or original Bill of Sale are required for all Furs, Fine Arts, Jewelry and Antiques.

C)  The Insured will not grant any waivers of subrogation to any packers and/or carriers.

This Company shall not be liable beyond the amount declared of the property at the time any loss or damage occurs and shall in no event exceed what it would then cost to repair or replace with the same material of like kind quality.

This Insurance shall also cover professional packing and unpacking by the carrier at the point of origin and destination and replacing from vans into domestic pack short of destination.

This Insurance shall also cover temporary storage at point of origin and/or destination for a period not exceeding thirty (30) days or held covered if exceeding said time limit, at an additional premium to be agreed. The Insured agrees to promptly notify This Company of the facts as soon as the situation for which they are "held covered" is known.

16.1.3   Refrigerated Beer Shipments

Against all risks of physical loss or damage from any external cause irrespective of percentage (excluding the risks excepted by the F.C. & C. warranty and S.R. & C.C. warranties unless otherwise provided herein) including loss, damage, deterioration and/or spoilage of the interest insured caused by the vessel (or other conveyance) being stranded, sunk, burnt, in collision or coming into contact with any substance (ice included) other than water.

This insurance is also extended to cover loss, damage, spoilage and/or deterioration due to or caused by derangement, breakdown or stoppage of refrigeration machinery and/or refrigeration plant and/or insulation. Including loss, damage, spoilage and/or deterioration caused by or resulting from heating and/or freezing and all loss, damage, spoilage and/or deterioration consequent upon the vessel (or other conveyance) being hijacked, from shore perils, and/or from being disabled from any cause and thereby being delayed and/or during delay or deviation as a result of mis-delivery, non-delivery, and/or late delivery or in consequence of a General Average Act.

It is further understood and agreed that this insurance is extended to cover loss or damage due to decay and deterioration to the interest insured as a result of negligence in stowage and/or incorrect temperature setting and/or vent setting by the carrier or persons responsible for the carriage and/or transportation and/or storage as well as damage caused by interruption of services provided by any public or private utility or other service organization, including heat, light, satellites, communications, power, water, gas or other service.

16.1.4    Hops Shipments:

Against all risks of physical loss or damage as per the attached Institute Commodity Trades Clauses (A) set forth in Endorsement No. 5, except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty and/or other warranties or exclusions specified in this policy unless covered elsewhere herein, irrespective of percentage.  Coverage to include but not limited to loss and/or damages due to contamination, infestation, and water damage.

Warranted that all cargoes are loaded and stowed in accordance with United States Coast Guard and/or Canadian Coast Guard regulations governing the safe and proper stowage of grain.  The loading and storage of grain to be done under the supervision of a surveyor appointed by the National Cargo Bureau or in accordance with the requirements of the bulk grain international regulations.  It is further warranted that all USDA and/or Canadian Grain Commission regulations are complied with and certificate(s) obtained prior to commencement of loading cargo.

No inadvertent error or omission, or failure to make, declarations shall prejudice the Insured's right of recovery, but shall be corrected as soon as practicable after it is discovered.

16.1.5    Automobiles:

Against All Risk of physical loss or damage from any external cause, but excluding marring, scratching, denting and/or chipping. Notwithstanding anything in this policy to the contrary, coverage attaches from the time the automobile is delivered to the overseas carrier and covers while in due course of transit until delivered to the owner or representative at destination, but in no event to exceed seventy two hours prior to sailing nor after discharge of the automobile from the overseas conveyance at destination.

16.1.6    This Insurer is also to pay for any expense resulting from explosion, howsoever and wheresoever occurring, except explosions resulting from those risks as may be excluded by the F.C.&S. and the S.R. & C.C. warranties (this risk is referred to as the **"Explosion Peril"**).

16.1.7    This Insurer is also to pay for any expense resulting, while the goods and/or merchandise and/or property are  on docks, wharves, quays or elsewhere on shore and during land transportation, from fire, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft or collision, derailment or any accident to the conveyance or collapse or subsistence of docks, wharves, quays or structures (these risks are referred to as the **"Shore Perils"**).

16.2     The goods and/or merchandise and/or property listed in Sub-Clause 16.2.6 are insured:

Against all risks of physical loss or damage from any external cause, except those risks as may be excluded by the F.C. & S. warranty, S.R. & C.C. warranty, or other warranties or exclusions specified in this policy, unless covered elsewhere herein, but warranted free of particular average unless the vessel or craft be stranded, sunk, burnt or in collision (these risks are referred to as the **"FPA Perils"**). Notwithstanding this average warranty, This Insurer is to pay for:

16.2.1     any physical loss of or damage to the goods and/or merchandise and/or property which may reasonably be attributed to fire or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to the discharge of the goods and/or merchandise and/or property at a port of distress,

16.2.2     any physical loss of or damage to the goods and/or merchandise and/or property resulting from the bursting of boilers, breakage of shafts or from any latent defect in the machinery, hull or appurtenances of the vessel and/or craft and/or conveyance, or from faults or errors in the navigation or management of the vessel and/or craft by the master, mariners, engineers or pilots (these risks are referred to as the **"Inchmaree Perils"**),

16.2.3     any physical loss of or damage to the goods and/or merchandise and/or property or expense resulting from explosion, howsoever or wheresoever occurring, except explosions resulting from those risks as may be excluded by the F.C.& S. and the S.R. & C.C. warranties specified in this policy,

16.2.4     any physical loss of or damage to the goods and/or merchandise and/or property resulting from the conveyance and/or location being fumigated by order of a properly constituted authority or otherwise,

16.2.5     any physical loss of or damage to the goods and/or merchandise and/or property or expense resulting, while the goods and/or merchandise and/or property are on docks, wharves, quays or elsewhere on shore and during land transportation, from fire, sprinkler leakage, lightning, cyclone, hurricane, earthquake, windstorm, hail, landslide, volcanic eruption, flood, rising water, aircraft, objects falling from aircraft or collision, derailment or any accident to the conveyance or collapse or subsistence of docks, wharves, quays or structures.

16.2.6     List of goods and/or merchandise and/or property:

NOT APPLICABLE

17.    WAREHOUSE TO WAREHOUSE AND MARINE EXTENSION:

17.1    Notwithstanding anything to the contrary contained in or endorsed on this policy, it is understood and agreed that the following terms and conditions shall apply to all shipments:

     17.1.1   This insurance attaches from the time the goods and/or merchandise and/or property leave the warehouse, store or other location at the place named in the policy, special policy, certificate or declaration for the commencement of the transit and continues until the goods and/or merchandise and/or property are delivered to the final warehouse, store or other location at the destination named in the policy, special policy, certificate or declaration, or a substituted destination as provided in Sub-Clause 17.1.3 below.

     17.1.2   This insurance specially to cover the goods and/or merchandise and/or property, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, during,

         (i)    deviation, delay, forced discharge, re-shipment and transshipment, and

         (ii)    any other variation of the adventure arising from the exercise of a liberty granted to the shipowner or charterer under the contract of affreightment.

     17.1.3   In the event of the exercise of any liberty granted to the shipowner or charterer under the contract of affreightment whereby such contract is terminated at a port or place other than the original insured destination, this insurance continues, subject to the applicable insuring conditions set forth elsewhere in this policy, until the goods and/or merchandise and/or property are sold and delivered at such port or place; or, if the goods and/or merchandise and/or property are not sold, but are forwarded to the original insured destination or to any other destination, this insurance continues until the goods and/or merchandise and/or property are delivered to the final warehouse, store or other location.

     17.1.4   If, while this insurance is still in force and before the expiry of fifteen (15) days from midnight of the day on which the over the side discharge of the goods and/or merchandise and/or property from the overseas vessel at the final port of discharge is completed, the goods and/or merchandise and/or property are re-sold (but not being a sale within the terms of Sub-Clause 17.1.3) and are to be forwarded to a destination other than that covered by this insurance, the goods and/or merchandise and/or property are covered under this policy while deposited at such port of discharge until again in transit or until the expiry of the aforementioned 15 days, whichever shall first occur. If a sale is effected after the expiry of the aforementioned 15 days while this insurance is still in force, the protection afforded under this Sub-Clause 17.1.4 shall cease as from the time of the sale.

     17.1.5   Shipments are held covered, at a premium to be arranged, in case of change of voyage or of any omission or error in the description of the goods, merchandise, property, vessel or voyage.

17.1.6   This insurance shall in no case be deemed to extend to cover loss, damage or expense proximately caused by delay or inherent vice or the nature of the goods and/or merchandise and/or property insured.

17.2   It is necessary for The Insured to give prompt notice to This Insurer when The Insured's corporate risk manager or equivalent becomes aware of an event for which it is "held covered".

17.3   All other terms, conditions and warranties of the policy not in conflict with the foregoing remain unchanged, it being particularly understood and agreed that the F.C. & S. warranty specified in this policy remains in full force and effect, and that nothing in the foregoing shall be construed as extending this insurance to cover any risks of war or consequences of hostilities.

18.   APPLICATION OF WAREHOUSE TO WAREHOUSE AND MARINE EXTENSION:

18.1   Regardless of the terms of purchase, sale, bill(s) of lading or other documentation issued to the contrary, and provided The Insured is obligated to insure the main carriage, this insurance covers from warehouse to warehouse in accordance with the clauses contained in this policy.

18.2   In the event a claim arises under this Clause, The Insured agrees to use all reasonable means to first recover the full amount of such loss from the seller or buyer, as the case may be, in accordance with the terms of the purchase or sale prior to calling on this insurance for payment.

19.   LOADING/UNLOADING:

This insurance is extended to cover, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, goods and/or merchandise and/or property intended for shipment (i) during the loading process prior to dispatch (including, into containers, trailers and rail cars) and continuing thereafter while they await the commencement of the transit and (ii) after they arrive at the final destination, and continuing thereafter, until they are promptly unloaded (including, from containers, trailers and rail cars) and throughout the unloading process.

20.   RECOOPERING/REPACKING:

20.1   In the event the packaging of the goods and/or merchandise and/or property insured under this policy is damaged due to a risk insured against, this Insurer will pay the cost of recoopering and/or the cost of new packaging.

20.2   In respect of packaging which falls outside the above provisions, it is agreed that should the outer packaging be damaged from an insured risk which renders the insured goods and/or merchandise and/or property unfit for on-shipment or distribution, irrespective of the final destination shown herein, This Insurer will pay the expense of reasonable repackaging, provided such damage occurred during the currency of this insurance.

21.    BOTH TO BLAME:

    21.1    In the event the bill(s) of lading, charter party or contract of carriage for the goods and/or merchandise and/or property insured under this policy contain the so-called "Both to Blame Collision Clause," This Insurer agrees (provided and to the extent that the loss, damage or claim so set off, recouped or recovered is the kind of loss, damage or expense recoverable under this policy) to indemnify The Insured for the amount which it is legally bound to pay to the shipowner, charterer, or carrier under such clause.

    21.2    In the event such liability is asserted, The Insured agrees to notify This Insurer who shall have the right, at its own cost and expense, to defend The Insured against such claim and The Insured agrees to provide reasonable assistance in any defense.

22.    INTERRUPTION OF TRANSIT:

Notwithstanding anything to the contrary contained in or endorsed on this policy, this insurance is extended to cover goods and/or merchandise and/or property insured under this policy whenever same are stopped in transit, anywhere in the world, short of final destination, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy.

23.    GOVERNMENTAL DAMAGE:

    23.1    DELIBERATE DAMAGE - POLLUTION HAZARD:

This insurance is extended to cover, subject to the applicable insuring terms, conditions and warranties set forth elsewhere in this policy, loss of and damage to an insured shipment directly caused by a governmental authority acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that absent the governmental action, the shipment would have sustained physical loss or damage as a result of the occurrence which prompted the governmental action and would have resulted, subject to the terms, conditions and warranties in this policy, in a claim recoverable under this policy.

    23.2    DELIBERATE DAMAGE - SERVICES:

This insurance also covers, notwithstanding the F.C. & S. warranty specified in this policy, and subject to all other insuring terms, conditions and warranties set forth elsewhere in this policy, physical loss of and damage to the shipment arising out of the performance of inspection duties by customs service agents or other duly constituted governmental agencies.

24.    MACHINERY:

When the goods and/or merchandise and/or property insured under this policy include a machine or other article consisting, when complete for sale or use, of several parts, then in case of loss or damage covered by this insurance to any part of such machine or other article, This Insurer shall be liable only for the proportion of the insured value applicable to the part or parts lost or damaged, or at The Insured's option, for the cost and expense of replacing or repairing the lost or damaged part or parts (including any and all expediting, labor and installation charges) so that the machine or article is restored to its condition at the time of shipment, but in no event shall This Insurer's liability under this Clause exceed the insured value of the machine or article as the case may be.

25.    BRANDS AND TRADEMARKS:

25.1    In case of damage to goods and/or merchandise and/or property insured under this policy bearing a brand or trademark, the sale of which in any way carries or implies a guarantee, the salvage value of such damaged goods and/or merchandise and/or property shall be determined after removal of all brands and trademarks.

25.2    With respect to packaging from which the brand or trademark cannot be removed, the contents shall be transferred into plain packaging, subject always to the consent of The Insured.

25.3    With respect to any goods and/or merchandise and/or property for which it is deemed by The Insured to be impractical to destroy all evidence of The Insured's connection therewith, This Insurer agrees to waive its right to salvage and The Insured is granted the option to destroy such damaged goods and/or merchandise and/or property. If the Insured exercises its option to destroy any damaged goods and/or merchandise and/or property This Insurer shall be given the opportunity to have a representative in attendance during such destruction.

25.4    The cost to remove brands and trademarks, as well as the cost to remove the contents from their original packaging and transfer them into plain packaging, shall be borne by This Insurer, but in no event shall This Insurer be liable for more than the insured value of the damaged goods and/or merchandise and/or property.

26.    LABELS:

In case of damage affecting labels, capsules or wrappers, This Insurer, if liable therefore under the terms, conditions and warranties of this policy, shall be liable only for an amount sufficient to pay for the cost of new labels, capsules or wrappers and the cost of reconditioning the goods and/or merchandise and/or property, but in no event shall This Insurer be liable for more than the insured value of the damaged goods and/or merchandise and/or property.

27.    PAIR AND SETS:

It is understood and agreed that the loss of or damage to any one item of the goods and/or merchandise and/or property insured under this policy which consist of items in a pair or set, shall constitute a total loss of such pair or set.

28.     <u>CONTROL OF DAMAGED GOODS AND/OR MERCHANDISE AND/OR PROPERTY</u>:

    28.1     Notwithstanding anything to the contrary (including the Brands and Trademarks Clause and the Labels Clause) contained elsewhere in this policy, it is understood and agreed that in case of damage to goods and/or merchandise and/or property insured under this policy, The Insured is to retain full and absolute discretion and control over the disposition of all such goods and/or merchandise and/or property. It is understood that The Insured shall be the sole judge as to whether disposal or sale of such goods and/or merchandise and/or property is detrimental to its interest.

    28.2     Any goods and/or merchandise and/or property which The Insured deems unfit for sale or which it is unable to sell or dispose of under its agreement with any trade association or other entity, shall be treated as a constructive total loss, and The Insured shall dispose of the goods and/or merchandise and/or property to its best advantage with This Insurer being entitled to its share of the net proceeds resulting from such disposition, or the goods and/or merchandise and/or property shall be destroyed after notification to This Insurer and any expenses incurred in connection with such destruction shall be borne by This Insurer. This Insurer shall be given the opportunity to have a representative in attendance during such destruction.

29.     <u>SHORTAGE FROM CONTAINERS, ETC.</u>:

    This Insurer is to pay for shortage of contents, meaning thereby, the difference between the number of items loaded or alleged to have been loaded in the intermodal container, trailer or railcar as per the shipper's or supplier's invoice or packing list and the number of items removed therefrom and received by The Insured or its agent at the time the container, trailer or rail car is unloaded howsoever, wheresoever and whensoever occurring.

30.     <u>CONCEALED DAMAGE</u>:

    30.1     With respect to goods and/or merchandise and/or property insured under this policy which are unloaded and received into the custody and control of the receiver at the warehouse, store or other location at destination ("date of receipt"), but are not immediately unpacked, then any damage to the goods and/or merchandise and/or property not discovered until they are unpacked shall, in the absence of proof to the contrary and provided they are unpacked within the 90th day after the date of receipt, be deemed to have occurred during the period of coverage under this policy.

    30.2     If damage is discovered after the ninety (90) day period, but the damage occurred during the period of coverage under this policy, the burden to show when the damage occurred shall revert to The Insured.

    30.3     Nothing contained in this Clause shall be construed to limit or reduce the coverage provided in this policy.

31. <u>GENERAL AVERAGE:</u>

This insurance also covers general average, salvage and special charges and expenses which are payable for the goods and/or merchandise and/or property insured under this policy as provided in the contract of affreightment or in accordance with the laws and usages at the port of destination or in accordance with a foreign statement.

32. <u>INSUFFICIENCY OF PACKING:</u>

32.1  In the event of a claim being made for loss or damage which is alleged to be caused by insufficiency or unsuitability of packing or preparation of the insured goods and/or merchandise and/or property, This Insurer hereby agrees that it will not assert such alleged insufficiency or unsuitability as a defense against the claim in any case where the packing or preparation was carried out by a party other than The Insured making claim and the insufficiency or unsuitability arose without The Insured's privity or knowledge.

32.2  For the purpose of this Clause, "packing" shall be deemed to include stowage in a container, trailer or rail car.

33. <u>DEBRIS REMOVAL:</u>

33.1  This insurance also covers expenses incurred by The Insured to remove and dispose of any remainder or residue of the insured goods and/or merchandise and/or property, including packing materials, which may be occasioned by a loss or damage caused by any of the risks insured against except that This Insurer shall not be liable under this Clause for more than 10% of the policy limit of liability set forth elsewhere in this policy.

33.2  Nothing in this Clause, however, shall be construed to extend cover to include any expenses incurred by The Insured to remove or dispose of the remainder or residue of the insured goods and/or merchandise and/or property if The Insured is responsible for such removal or disposal under any pollution statute. Expenses incurred by The Insured to accomplish such removal or disposal are not covered under this policy.

34. <u>INCREASED VALUES AND/OR PROFITS:</u>

34.1  This insurance shall also cover increased values and/or profits on shipments purchased by The Insured on CIF terms or other similar terms under which the seller provides transit insurance for the account of The Insured.

34.2  In the event of a total or constructive total loss of the shipment, the increased values and/or profits shall be the difference between the amount of the insurance actually provided by the seller and the value of the shipment as calculated under the valuation provisions set forth elsewhere in this policy.

34.3  In the event of a partial loss of the shipment, This Insurer shall not be liable under Sub-Clause 34.1 for a greater percentage of the loss, damage or expense than would be payable on the shipment if it had originally been insured by This Insurer.

34.4    The coverage provided in this Clause shall be free of claims for general average, salvage and special charges and expenses except on the portion of the contributory value of the shipment in excess of the amount actually insured and only if uncollectible under the insurance provided by the seller.

34.5    The coverage provided in this Clause shall be without benefit of salvage unless the terms of the insurance provided by the seller permit participation.

## 35. FRAUDULENT BILLS OF LADING:

This policy also covers physical loss incurred by The Insured through the acceptance by The Insured, its agents or the shipper of fraudulent bills of lading, shipping receipts, messenger receipts, warehouse receipts or other shipping documents.

## 36. DEMURRAGE CHARGES:

If The Insured is directed by This Insurer to retain a container, trailer or rail car and if The Insured is assessed a late penalty and/or demurrage charge for the holding of the container, trailer or rail car past the return date, This Insurer will pay late penalties and demurrage charges. The amount This Insurer will pay shall be the charges assessed until such time as This Insurer and The Insured agree that the container, trailer or rail car may be released.

## 37. LANDING, WAREHOUSING:

37.1    In the event of frustration, interruption, or termination of the insured voyage, or similar events beyond the control of The Insured and in addition to the limit(s) of liability set forth elsewhere in this policy, This Insurer agrees to pay all landing, warehousing, transshipping, forwarding and other expenses incurred by The Insured to forward the insured goods and/or merchandise and/or property to the original or substituted final destination should same be incurred by reason of a risk insured against, including as a result of the insolvency or financial default of the owner, charterer, manager or operator of the vessel or other conveyance.

37.2    In such circumstances and notwithstanding any average warranty contained elsewhere in this policy, This Insurer will also pay (i) any partial loss or damage to the shipment arising from any loading, transshipment, forwarding or discharge and (ii) the full insured value of any package, piece or unit in the shipment which is totally lost in loading, transshipment, forwarding or discharge, including loss of and damage to any such package, piece or unit which may be reasonably attributed to discharge at a port of distress.

## 38. EXPEDITING COST:

Where there is loss, damage, general average, salvage and/or special charges which are the subject of a claim under this policy, and The Insured considers it necessary to forward damaged part(s) to manufactures for repair and return, or replacements and/or replacement parts by means other than the means by which the original shipment was dispatched, This Insurer will pay the reasonable expediting costs so involved in addition to the underlying claim.

39.  REFUSED OR RETURNED SHIPMENT:

This insurance covers, subject to the applicable insuring conditions set forth elsewhere in this policy, all shipments which may be refused and are to be returned by the consignee or others while awaiting shipment or reshipment and until received by The Insured or otherwise disposed of.

40.  FOB, FAS, CFR SHIPMENTS:

40.1    This insurance is extended to cover and will attach to goods and/or merchandise and/or property sold by The Insured on FOB, FAS, and CFR terms, or on similar terms, whereby The Insured is not required to provide transit insurance, from the time the goods and/or merchandise and/or property, or any portion thereof, depart from the warehouse, store, factory, or other location at the initial point of shipment (including while loaded in railroad cars while in or on private sidings prior to the issuance of the railroad bill(s) of lading) and continuing thereafter until all of the goods and/or merchandise and/or property are delivered alongside the overseas vessel or other conveyance or loaded on board the overseas vessel or conveyance as per the terms of sale.

40.2    It is agreed that the coverage provided under the terms of this Clause shall be subject to the applicable terms, conditions and warranties set forth elsewhere in this policy.

41.  DIFFERENCE IN CONDITIONS:

41.1    With respect to goods and/or merchandise and/or property purchased by The Insured on CIF or similar terms, where transit insurance is arranged by the seller or others, this insurance is extended to cover the difference in the terms, conditions and warranties between the terms, conditions and warranties of such other insurance and the terms, conditions and warranties of this insurance, if the goods and/or merchandise and/or property would otherwise have been insured hereunder.

41.2    All goods and/or merchandise and/or property insured under this Clause shall be valued as per the valuation provisions set forth elsewhere in this policy.

41.3    It is noted and agreed that where The Insured is obliged by legislation or otherwise to arrange transit insurance locally, it shall continue to have the full benefit and protection of this insurance for any difference between this insurance and the terms, conditions and warranties in the insurance arranged elsewhere.

41.4    It is agreed that nothing in this Clause shall be construed to extend the obligation of This Insurer to pay more than the limit(s) of liability set forth elsewhere in this policy.

42.  CONTINGENT INTEREST/UNPAID VENDORS:

42.1    This insurance is extended to cover the interest of The Insured, as a vendor in a credit transaction, on all shipments made by The Insured on terms under which The Insured is not obliged to furnish transit insurance.

42.2     This Insurer will guarantee to The Insured the prompt collection of losses, damages and expenses otherwise coming within the terms, conditions and warranties of this insurance in connection with shipments for which The Insured has not been paid. This Insurer will advance to The Insured the amount of the loss, damage or expense, as a loan without interest. Such advance shall be repayable upon, but subject to and only to the extent of (i) the receipt of the purchase price by The Insured, or (ii) any recovery received by The Insured from insurance effected by the buyer or otherwise.

42.3     It is agreed that the coverage provided under the terms of this Clause shall be subject to the applicable terms, conditions and warranties set forth elsewhere in this policy.

42.4     All goods and/or merchandise and/or property insured under this Clause shall be valued as per the valuation provisions set forth elsewhere in this policy.

42.5     The Insured agrees to not divulge the existence of the coverage provided by this Clause, and to use all reasonable means to collect the full amount due from the buyer or others, as the case may be.

## 43.   GUARANTEE OF COLLECTIBILITY:

43.1     With respect to all goods and/or merchandise and/or property purchased by The Insured on CIF or similar terms, where the seller is required to furnish transit insurance, This Insurer guarantees collection of any claim recoverable under the seller's transit insurance, but only to the extent the claim would be recoverable under the terms, conditions and warranties set forth in this policy if the goods and/or merchandise and/or property had been insured hereunder.

43.2     In no event shall this insurance inure to the benefit of the seller or his insurer, and The Insured agrees to make, and will make, all reasonable efforts to collect the full amount of any loss, damage or expense from the seller and his insurer, but in the event The Insured is unsuccessful in making a recovery, This Insurer will advance to The Insured the amount of the uncollected loss, damage or expense as a loan without interest.

## 44.   SUE AND LABOR:

44.1     In the case of any imminent or actual loss or misfortune, it shall be lawful and necessary to and for The Insured, its factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the goods and/or merchandise and/or property insured hereunder, or any part thereof, without prejudice to this insurance.

44.2     The acts of The Insured or This Insurer in recovering, saving and preserving the insured goods and/or merchandise and/or property in case of disaster shall not be considered a waiver or an acceptance of an abandonment.

44.3     This Insurer will pay all such sue and labor expenses subject to the limit of liability set forth elsewhere in this policy.

45.   DELAY:

This insurance is warranted free from, and shall not cover, loss of market or loss, damage or expense arising from delay, regardless of whether such delay is caused by a risk insured against or otherwise, unless such risks are expressly assumed elsewhere in this policy.

46.   CARRIER OR BAILEE:

Warranted that this insurance shall not inure, directly or indirectly, to the benefit of any carrier or bailee.

47.   PARAMOUNT WARRANTIES:

The following warranties and clauses shall be paramount and shall not be modified or superseded by any other provision included herein or stamped or endorsed hereon, unless such other provision specifically refers to the risks excluded by these warranties and clauses and expressly assumes the said risks:

47.1   F.C. & S. WARRANTY:

THIS INSURANCE IS WARRANTED FREE FROM:

47.1.1   capture, seizure, arrest, restraint, detainment, confiscation, preemption, requisition or nationalization, and the consequences thereof or any attempt thereat, whether in time of peace or war and whether lawful or otherwise;

47.1.2   all loss, damage or expense, whether in time of peace or war, caused by (i) any weapon of war employing atomic or nuclear fission and/or fusion or other reaction or radioactive force or matter or (ii) any mine or torpedo;

47.1.3   all consequences of hostilities or warlike operations (whether there be a declaration of war or not), but this warranty shall not exclude collision or contact with aircraft, or with rockets or similar missiles (other than weapons of war) or with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather, fire or explosion, unless caused directly (and independently of the nature of the voyage or service which the vessel concerned or, in the case of a collision, any other vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purpose of this warranty "power" includes any authority maintaining naval, military or air forces in association with a power; and

47.1.4   the consequences of civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; or from the consequences of the imposition of martial law, military or usurped power, or piracy.

47.2    S.R. & C.C. WARRANTY:

THIS INSURANCE IS WARRANTED FREE FROM LOSS, DAMAGE OR EXPENSE CAUSED BY OR RESULTING FROM:

47.2.1    strikes, lockouts, labor disturbances, riots, civil commotions, or the acts of any person or persons taking part in any such occurrences or disorders; and

47.2.2    vandalism, sabotage or malicious act, which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional.

47.3    NUCLEAR EXCLUSION:

47.3.1    Notwithstanding anything to the contrary in this policy, it is hereby understood and agreed that this policy shall not cover any loss, damage or expense due to or arising out of, whether directly or indirectly, nuclear reaction, radiation or radioactive contamination, regardless of the proximate cause of the loss, damage or expense. However, subject to all provisions of this policy, physical loss or damage to the shipment is covered if fire is the proximate cause of the physical loss or damage and the shipment is located within the United States, or a territory of the United States or Puerto Rico, and if the fire was due to or arose out of one or more of the above excluded risks, provided that the nuclear reaction, radiation, or radioactive contamination was not caused, whether directly or indirectly, by any of the risks excluded by the F.C. & S. warranty specified in this policy.

47.3.2    Nothing in Sub-Clause 47.3.1 shall be construed to cover any loss, damage, liability or expense caused by nuclear reaction, radiation or radioactive contamination arising directly or indirectly from the fire mentioned in said sub-clause.

48.    NEGLIGENCE:

48.1    The Insured is not to be prejudiced by the presence of the negligence clause and/or latent defect clause in the bill(s) of lading, charter party, contract of carriage or other contract.

48.2    The seaworthiness of the vessel, as between The Insured and This Insurer, is hereby admitted, and the wrongful act or misconduct of the shipowner, charterer or carrier, or their servants causing loss, damage or expense shall not defeat recovery under this policy, if the loss, damage or expense in the absence of such wrongful act or misconduct would have been a loss, damage or expense recoverable under this policy.

49.   **LETTER OF CREDIT:**

    49.1    Permission is also granted to The Insured to attach the London Institute Cargo Clauses and War, Strikes, Riots and Civil Commotions Clauses or other London or American Institute Clauses to special policies and/or certificates of insurance where such clauses are required by the terms of sale, letter of credit or other banking requirements. When such an attachment is made, the attached clause(s) will be deemed to be added to this policy. If, by the deemed addition of such clause(s) to this policy, an inconsistency is created between or among a term, condition or warranty in the deemed added clause(s) and a term, condition or warranty set forth in this policy, then the term, condition or warranty that will result in the maximum scope of coverage shall override and control to the extent of the inconsistency.

    49.2    If the terms and conditions of such attached clauses provide broader coverage than those in this policy, This Insurer is entitled to additional premium, if any, to be agreed.

50.   **WAIVER AND/OR RELEASE:**

Privilege is given to The Insured to enter into and to accept contracts and agreements and any and all other documents (whether for carriage or otherwise) from any third party, containing waivers and/or releases of liabilities, provided such acceptance is made prior to any known or reported loss or accident.

51.   **INSURABLE INTEREST:**

With respect to the coverages provided in this policy, whether they be contingent, extended or otherwise, the insurable interest of The Insured is admitted at all times.

52.   **PROTECTION OF SUIT TIME:**

    52.1    This Insurer and The Insured agree that, after This Insurer has been notified of a claim for loss, damage or expense recoverable under this policy, This Insurer shall be responsible for protecting suit time against all persons who may be liable for such loss, damage or expense. The Insured agrees to cooperate with This Insurer to protect suit time.

    52.2    If, solely because of the failure of The Insured to (i) give This Insurer timely notice of the claim or (ii) cooperate with This Insurer to protect suit time, suit time is not protected, The Insured's claim will not be vitiated, but the claim may be reduced by the amount of the expected reasonable recovery from the liable party(ies).

53.   **NOTICE OF LOSS:**

The Insured shall report to (i) Marsh Inc. for transmission to This Insurer, (ii) This Insurer, or (iii) the agent of This Insurer if there be one at or near the place where the loss or damage occurs or expenses are incurred, or if there be none in the vicinity, to (iv) the local correspondent of the American Institute of Marine Underwriters or (v) the local Lloyd's Agent, loss, damage and expenses which may become a claim under this insurance as soon as may be practicable after it becomes known to the corporate risk manager or equivalent of The Insured.

54.   PARTIAL LOSS:

54.1   In case of a covered partial loss to the goods and/or merchandise and/or property insured under this policy caused by risks insured against, the loss shall be determined by a separation of the damaged portion of the insured goods and/or merchandise and/or property from the sound and shall be the percentage of damage on the damaged portion as agreed by The Insured and This Insurer.

54.2   If no percentage is mutually agreed upon, then by public sale of the damaged portion for the account of The Insured and by comparison of the amount so realized with the market value of the damaged portion if it were in sound condition on the day of sale.

54.3   At the option of The Insured, claims for insured goods and/or merchandise and/or property arriving at destination in a damaged condition may be settled on a "salvage adjustment" basis, with This Insurer paying the insured value of the damaged portion after taking credit for any salvage proceeds.

55.   CONSTRUCTIVE TOTAL LOSS:

No recovery for a constructive total loss shall be had under this policy unless (i) the insured goods and/or merchandise and/or property are reasonably abandoned on account of their actual total loss appearing to be unavoidable, or (ii) because they can not be preserved from actual total loss without incurring an expenditure which, if incurred, The Insured reasonably believes would exceed the expected value of the goods and/or merchandise and/or property.

56.   OTHER INSURANCE:

56.1   In case the goods and/or merchandise and/or property, insured under this policy are covered by other insurance (except as hereinafter provided), the covered loss, damage or expense shall be collected from the several policies in the order of the date of their attachment.

56.2   Insurances attaching on the same date are deemed simultaneous and are to contribute pro rata; provided, however, that where any fire insurance, or any insurance (including fire) taken out by any carrier or bailee (other than The Insured) is available to the beneficiary of this policy, or would be so available if this insurance did not exist, then this insurance shall be void to the extent that such other insurance is or would have been available.

56.3   It is agreed, nevertheless, that where This Insurer is thus relieved of a liability because of the existence of other insurance, This Insurer shall receive and retain the premium payable under this policy and, in consideration thereof, shall guarantee the solvency of the companies and/or insurers who issued such other insurance and the prompt collection of the loss, damage or expense thereunder, but only to the same extent that This Insurer shall have been relieved of liability by reason of the terms of this Clause and not exceeding, in any case, the amount which would have been collectible under this policy if such other insurance did not exist.

57.   **PAYMENT OF LOSS:**

    57.1   All claims are to be paid to The Insured within thirty (30) days after satisfactory proof of loss has been filed with This Insurer.

    57.2   It is agreed that claims for loss of or damage to insured goods and/or merchandise and/or property falling within the scope of this policy which amount to less than $10,000.00 as adjusted, shall be paid by This Insurer within thirty (30) days following the submission of the following applicable supporting documents:

        (a)   bill of lading or air waybill or warehouse receipt

        (b)   commercial invoice

        (c)   claim against carrier/warehouse/other responsible party

        (d)   certificate of insurance if applicable or letter of indemnity

        (e)   any writing stating that a loss has occurred, e.g., (but without limitation) statement of claim from The Insured or its customer, or exceptions taken on delivery if included with original submission or customer credit memo.

58.   **PAYMENT ON ACCOUNT:**

When the claim documents submitted demonstrate, and This Insurer and The Insured agree, that only the quantum of the claim is yet to be agreed, a payment on account will be made equal to the lower of the amount (i) claimed by The Insured or (ii) agreed to by This Insurer or the surveyor approved by This Insurer, within 10 business days after such agreement.

59.   **SUBROGATION:**

    59.1   It is agreed that upon payment of any loss, damage or expense under this policy, This Insurer shall become subrogated, to the extent of such payment, to the rights of The Insured against any carrier, bailee, seller, buyer, other insurer or other third party who may be liable for or who may have an obligation to pay, the loss, damage or expense.

    59.2   This Insurer, however, may not assert a subrogated claim against a parent, subsidiary or an affiliate of The Insured without The Insured's prior permission.

    59.3   This Insurer may not bring suit in the Insured's name without prior permission from The Insured, but if granted, always at This Insurer's expense.

    59.4   The Insured agrees to render all reasonable assistance in the prosecution of subrogated claims by This Insurer.

59.5    Any recovery made by This Insurer in connection with a subrogated claim shall be shared with The Insured on a proportionate basis. The Insured's share shall be calculated by multiplying the gross recovery (after deducting only the actual expense of This Insurer to prosecute the claim) by the percentage obtained after dividing the sum of any deductible plus any uninsured loss, damage and expense by the sum of the deductible plus any uninsured loss, damage and expense plus the amount of loss, damage and expense paid by This Insurer. This Insurer retains the balance.

60.    SUBSTITUTION:

Wherever the words "This Insurer" appear in the policy they are deemed to include the plural "These Insurers."

61.    PRECEDENCE OF CONDITIONS:

The terms, conditions and warranties contained in this manuscript policy shall override anything that is at variance, or inconsistent with or contradictory to the printed policy to which this manuscript policy may be attached.

62.    CAPTIONS:

The captions of the clauses set forth in this policy are for reference purposes only and shall not be deemed to form part of this policy.

63.    SUIT AGAINST INSURER:

This Insurer agrees that any action or proceeding against This Insurer for the recovery of any claim under or by virtue of this insurance shall not be barred if commenced within the time prescribed therefore in the statutes of the State of New York.

64.    REQUIRED BY LAW:

Any provisions required by law to be stated in this policy by This Insurer are deemed to be stated herein.

65.    POLICY NUMBER:

Attached to and forming part of Policy Number **OC91183800 of AGCS Marine Insurance Company.**

66.    SIGNATURE OF THIS INSURER:

In WITNESS WHEREOF, This Insurer has executed, issued and delivered this policy at Chicago, Illinois this the **1st day of May, 2010.**

### SCHEDULE OF RATES

Attached to and forming part of Policy No. **OC91183800** of the **AGCS Marine Insurance Company**

These rates are effective with respect to all shipments of insured goods and/or merchandise and/or property made on and after **May 1, 2010** , which are shipped on metal-hulled, self-propelled vessels which are not over 20 years of age nor less than 1000 net registered tons and which are classed A1 American Record or equivalent by a member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by This Insurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built:

> for service on the Great Lakes; or
> solely for military or naval service; or
> for carriage of dry bulk or liquid bulk cargoes and which are more
> than 15 years of age, unless specifically approved by This Insurer.

All shipments of insured goods and/or merchandise and/or property which are made on vessels excluded or not provided for by the above wording are covered at rates to be arranged.

| **INTEREST:** | **RATE:** |
|---|---|
| Marine/War | FLAT |

All other shipments and/or interests at rates to be agreed.

Marine rates subject to change upon ninety (90) days notice from This Insurer.

# ENDORSEMENT NO. 1
## S.R.& C.C. ENDORSEMENT (FORM NO. 12A)

Attached to and made part of Sections I and, if purchased, II and III of Policy No.OC 91183800 of the AGCS MARINE INSURANCE COMPANY issued to **Anheuser-Busch InBev**

Effective with respect to shipments made on or after: 05/01/2010

**AIMU**
Endorsement for Open Policies (Cargo)
Strikes, Riots & Civil Commotions
(January 1, 2008)

THIS INSURANCE ALSO COVERS:

    (1) Physical loss of or damage to property insured directly caused by strikers, locked-out workmen, or persons taking part in labor disturbances or riots or civil commotions;

(2) Physical loss of or damage to the property insured directly caused by vandalism, sabotage or malicious acts; and,

(3) Physical loss of or damage to the property insured directly caused by the act or acts of one or more persons, whether or not agents of a sovereign power, carried out for political, terroristic or ideological purposes and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this subsection (3) be not excluded by the Free of Capture & Seizure Warranty, Extended Radioactive Contamination Exclusion Clause (Extended RACE Clause) or Chemical, Biological, Bio-Chemical and Electromagnetic Exclusion Clause (CBC Clause) in the Policy to which this endorsement is attached. Notwithstanding the foregoing, coverage under this subsection (3) is conditional upon the property insured being in the ordinary course of transit and, in any event, **shall terminate:**

(a) As per the Warehouse to Warehouse Clause, Marine Extension Clause, 60 Day South American Clause and any other clauses relating to duration of transit contained in or endorsed onto the Policy; or,

(b) on delivery to the consignee's or other final warehouse or place of storage at the destination named herein; or,

(c) on delivery to any warehouse or place of storage whether prior to or at the destination named herein, which the Assured elects to use either for storage other than in the ordinary course of transit or for allocation or distribution; or,

(d) in respect of marine transits, on the expiry of 60 days after completion of discharge overside of the property insured from the vessel at the port of discharge; or,

(e) in respect of air transits, on the expiry of 30 days after unloading the property insured from the aircraft at the place of discharge;

**whichever shall first occur.**

Notwithstanding the foregoing, nothing in this clause excludes coverage for insured losses, which are otherwise covered by this insurance, caused by certified acts of terrorism, as defined in the Terrorism Risk Insurance Act (P.L. #107-297) or any subsequent amendments or endorsements to the Act.

While the property insured is at risk under the terms and conditions of this insurance within the United States of America, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and Canada, this insurance is extended to cover physical loss of or damage to the property insured directly caused by acts committed by an agent of any government, party or faction engaged in war, hostilities or other warlike operations, provided such agent is acting secretly and not in connection with any operation of military or naval armed forces in the country where the described property is situated.

Nothing in this endorsement shall be construed to cover any loss, damage or expense directly or indirectly arising from, contributed to or caused by any of the following, whether due to a peril insured against or otherwise:

(a) change in temperature or humidity;

(b) the absence, shortage, or withholding of power, fuel, or labor of any description whatsoever during any strike, lockout, labor disturbance, riot or civil commotion;

(c) loss of market or loss, damage or deterioration arising from delay;

(d) hostilities, warlike operations, civil war, revolution, rebellion or insurrection, or civil strife arising therefrom, except to the limited extent that the acts of certain agents acting secretly have been expressly covered above; or,

(e) nuclear reaction, radiation or radioactive contamination, as per Extended RACE Clause;

(f) chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material, as per CBE Clause.

The Assured agrees to report all shipments attaching under this cover and to pay premiums therefore at the rates established by the Assurer from time to time.
This endorsement may be canceled by either party upon forty-eight hours written, telegraphic, telefaxed, or electronic notice to the other party, but such cancellation shall not affect any risks which have already attached hereunder.

Additional Premium to be agreed.

All other terms and conditions remain unchanged.

DATED: 07/08/2010
BROKER: MARSH USA

AGCS Marine Insurance Company

By: _____

## ENDORSEMENT NO. 2
### CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC TERRORISM EXCLUSION CLAUSE

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to **Anheuser-Busch InBev**

Effective: 05/01/2010

It is understood and agreed that effective from the above captioned date:

## CHEMICAL, BIOLOGICAL, BIO-CHEMICAL, ELECTROMAGNETIC TERRORISM EXCLUSION CLAUSE

**This clause shall be paramount and shall override anything contained in this insurance inconsistent therewith.**

In no case shall this insurance cover loss, damage, liability or expense directly or indirectly caused by or contributed to or arising from an actual or threatened act involving a chemical, biological, bio-chemical or electromagnetic weapon, device, agent or material when used in an intentionally hostile manner.

All other terms and conditions remain unchanged.

DATED: 07/08/2010
BROKER:MARSH USA

AGCS Marine Insurance Company

By:

## ENDORSEMENT NO. 3
### EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
### WITH U.S.A. ENDORSEMENT

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to
Anheuser-Busch InBev

Effective: 05/01/2010

AIMU
EXTENDED RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE
WITH U.S.A. ENDORSEMENT
(March 1, 2003)

**This clause shall be paramount and shall override anything contained in this insurance inconsistent
therewith.**

1. In no case shall this insurance cover loss damage liability or expense directly or indirectly caused by or
contributed to by or arising from

    1.1  ionizing radiations from or contamination by radioactivity from any nuclear fuel or from any nuclear
waste or from the combustion of nuclear fuel
    1.2  the radioactive, toxic, explosive or other hazardous or contaminating properties of any nuclear
installation, reactor or other nuclear assembly or nuclear component thereof
    1.3  any weapon or device employing atomic or nuclear fission and/or fusion or other like reaction or
radioactive force or matter.
    1.4  the radioactive, toxic, explosive or other hazardous or contaminating properties of any radioactive matter.
The exclusion in this sub-clause does not extend to radioactive isotopes. other than nuclear fuel, when such
isotopes are being prepared, carried, stored, or used for commercial, agricultural, medical, scientific or other
similar peaceful purposes.

**RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE**
**(U.S.A. ENDORSEMENT)**

This insurance is subject to the Extended Radioactive Contamination Exclusion Clause (March 1, 2003) provided
that if fire is an insured peril and where the subject matter insured or, in the case of a reinsurance, the subject matter
insured by the original insurance, is within the U.S.A., its islands, onshore territories or possessions and a fire arises
directly or indirectly from one or more of the causes detailed in Sub-Clauses 1.1, 1.2, and 1.4 of the Extended
Radioactive Contamination Exclusion Clause March 1, 2003 any loss or damage arising directly from that fire shall,
subject to the provisions of this insurance (reinsurance), be covered, EXCLUDING however any loss damage
liability or expense caused by nuclear reaction, nuclear radiation, or radioactive contamination arising directly or
indirectly from that fire.

All other terms and conditions remain unchanged.

DATE: 07/08/2010
BROKER: MARSH USA

AGCS Marine Insurance Company

By:

## ENDORSEMENT NO. 4
### AIMU Trade Sanctions

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to **Anheuser-Busch InBev**

Effective: 05/01/2010

**It is hereby understood and agreed that the following Clause is added to the Paramount Warranties of this Open Cargo Policy.**

**U.S. ECONOMIC AND TRADE SANCTION CLAUSE**

Whenever coverage provided by this policy would be in violation of any U.S. economic or trade sanctions such as, but not limited to, those sanctions administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), such coverage shall be null and void.

Similarly, any coverage relating to any certificates or other evidences of insurance or any claim that would be in violation of U.S. economic or trade sanctions as described above shall also be null and void.

All other terms and conditions remain unchanged.

DATED: 07/08/2010
BROKER: MARSH USA

AGCS Marine Insurance Company

By:

## ENDORSEMENT NO. 5
### Institute Commidity Trades Clauses (A)

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to
**Anheuser-Busch InBev**

Effective:  05/01/2010

It is understood and agreed that effective from the above captioned date:

As per Clause 16.1.4 'Hops Shipments' of the Policy to which this Endorsement is attached, the Institute
Commodity Trades Clauses (A) are attached to this endorsement as referenced in the clause.


All other terms and conditions remain unchanged.


DATED: 07/08/2010
BROKER:MARSH USA


AGCS Marine Insurance Company

By:

### INSTITUTE COMMODITY TRADES CLAUSES (A)

**Agreed with The Federation of Commodity Associations**
**for the insurance of shipments of**
**Cocoa, Coffee, Cotton, Fats and Oils not in bulk,**
**Hides, Skins and Leather, Metals, Oil Seeds, Sugar (Raw or Refined), and Tea**

## RISKS COVERED

1. This insurance covers all risks of loss of or damage to the subject-matter insured except as provided in Clauses 4, 5, 6 and 7 below.

   *Risks Clause*

2. This insurance covers general average and salvage charges, adjusted or determined according to the contract of affreightment and/or the governing law and practice, incurred to avoid or in connection with the avoidance of loss from any cause except those excluded in Clauses 4, 5, 6 and 7 or elsewhere in this insurance.

   *General Average Clause*

3. This insurance is extended to indemnify the Assured against such proportion of liability under the contract of affreightment "Both to Blame Collision" Clause as is in respect of a loss recoverable hereunder. In the event of any claim by shipowners under the said Clause the Assured agree to notify the Underwriters who shall have the right, at their own cost and expense, to defend the Assured against such claim.

   *"Both to Blame Collision" Clause*

## EXCLUSIONS

4. In no case shall this insurance cover

   *General Exclusions Clause*

   4.1 loss damage or expense attributable to wilful misconduct of the Assured

   4.2 ordinary leakage, ordinary loss in weight or volume, or ordinary wear and tear of the subject-matter insured

   4.3 loss damage or expense caused by insufficiency or unsuitability of packing or preparation of the subject-matter insured (for the purpose of this Clause 4.3 "packing" shall be deemed to include stowage in a container or liftvan but only when such stowage is carried out prior to attachment of this insurance or by the Assured or their servants)

   4.4 loss damage or expense caused by inherent vice or nature of the subject-matter insured

   4.5 loss damage or expense proximately caused by delay, even though the delay be caused by a risk insured against (except expenses payable under Clause 2 above)

   4.6 loss damage or expense caused by insolvency or financial default of the owners managers charterers or operators of the vessel where, at the time of loading of the subject-matter insured on board the vessel, the Assured are aware, or in the ordinary course of business should be aware, that such insolvency or financial default could prevent the normal prosecution of the voyage
   This exclusion shall not apply where this insurance has been assigned to the party claiming hereunder who has bought or agreed to buy the subject-matter insured in good faith under a binding contract

   4.7 loss damage or expense arising from the use of any weapon of war

employing atomic or nuclear fission and/or fusion or other like reaction or radioactive force or matter.

**5.**   **5.1**   In no case shall this insurance cover loss damage or expense arising from      Unseaworthiness and Unfitness Exclusion Clause

         5.1.1   unseaworthiness of vessel or craft or unfitness of vessel or craft for the safe carriage of the subject-matter insured, where the Assured are privy to such unseaworthiness or unfitness, at the time the subject-matter insured is loaded therein

         5.1.2   unfitness of container liftvan or land conveyance for the safe carriage of the subject-matter insured, where loading therein is carried out prior to attachment of this insurance or by the Assured or their servants.

     5.2   Where this insurance has been assigned to the party claiming hereunder who has bought or agreed to buy the subject-matter insured in good faith under a binding contract, exclusion 5.1.1 above shall not apply.

     5.3   The Underwriters waive any breach of the implied warranties of seaworthiness of the ship and fitness of the ship to carry the subject-matter insured to destination.

**6.**   In no case shall this insurance cover loss damage or expense caused by      War Exclusion Clause

     6.1   war civil war revolution rebellion insurrection, or civil strife arising therefrom, or any hostile act by or against a belligerent power

     6.2   capture seizure arrest restraint or detainment (piracy excepted), and the consequences thereof or any attempt thereat

     6.3   derelict mines torpedoes bombs or other derelict weapons of war.

**7.**   In no case shall this insurance cover loss damage or expense      Strikes Exclusion Clause

     7.1   caused by strikers, locked-out workmen, or persons taking part in labour disturbances, riots or civil commotions

     7.2   resulting from strikes, lock-outs, labour disturbances, riots or civil commotions

     7.3   caused by any terrorist or any person acting from a political motive.

## DURATION

**8.**   **8.1**   This insurance attaches from the time the goods leave the warehouse or place of storage at the place named herein for the commencement of the transit, continues during the ordinary course of transit and terminates either      Transit Clause

         8.1.1   on delivery to the Consignees' or other final warehouse or place of storage at the destination named herein,

         8.1.2   on delivery to any other warehouse or place of storage, whether prior to or at the destination named herein, which the Assured elect to use either

            8.1.2.1   for storage other than in the ordinary course of transit or

            8.1.2.2   for allocation or distribution,

or

8.1.3   on the expiry of 60 days after completion of discharge overside of the goods hereby insured from the oversea vessel at the final port of discharge,

whichever shall first occur.

8.2   If, after discharge overside from the oversea vessel at the final port of discharge, but prior to termination of this insurance, the goods are to be forwarded to a destination other than that to which they are insured hereunder, this insurance, whilst remaining subject to termination as provided for above, shall not extend beyond the commencement of transit to such other destination.

8.3   This insurance shall remain in force (subject to termination as provided for above and to the provisions of Clause 9 below) during delay beyond the control of the Assured, any deviation, forced discharge, reshipment or transhipment and during any variation of the adventure arising from the exercise of a liberty granted to shipowners or charterers under the contract of affreightment.

9.   If owing to circumstances beyond the control of the Assured either the contract of carriage is terminated at a port or place other than the destination named therein or the transit is otherwise terminated before delivery of the goods as provided for in Clause 8 above, then this insurance shall also terminate *unless prompt notice is given to the Underwriters and continuation of cover is requested when the insurance shall remain in force, subject to an additional premium if required by the Underwriters,* either      Termination of Contract of Carriage Clause

9.1   until the goods are sold and delivered at such port or place, or, unless otherwise specially agreed, until the expiry of 60 days after arrival of the goods hereby insured at such port or place, whichever shall first occur,

or

9.2   if the goods are forwarded within the said period of 60 days (or any agreed extension thereof) to the destination named herein or to any other destination, until terminated in accordance with the provisions of Clause 8 above.

10.   Where, after attachment of this insurance, the destination is changed by the Assured, *held covered at a premium and on conditions to be arranged subject to prompt notice being given to the Underwriters.*      Change of Voyage Clause

**CLAIMS**

11.  11.1   In order to recover under this insurance the Assured must have an insurable interest in the subject-matter insured at the time of the loss.      Insurable Interest Clause

11.2   Subject to 11.1 above, the Assured shall be entitled to recover for insured loss occurring during the period covered by this insurance, notwithstanding that the loss occurred before the contract of insurance was concluded, unless the Assured were aware of the loss and the Underwriters were not.

12.   Where, as a result of the operation of a risk covered by this insurance, the insured transit is terminated at a port or place other than that to which the subject-matter is covered under this insurance, the Underwriters will reimburse the Assured for any extra charges properly and reasonably incurred in unloading storing and forwarding the subject-matter to the destination to which it is insured hereunder.      Forwarding Charges Clause

This Clause 12, which does not apply to general average or salvage charges, shall be subject to the exclusions contained in Clauses 4, 5, 6 and 7 above, and shall not include charges arising from the fault negligence insolvency or financial default of the Assured or their servants.

13. No claim for Constructive Total Loss shall be recoverable hereunder unless the subject-matter insured is reasonably abandoned either on account of its actual total loss appearing to be unavoidable or because the cost of recovering, reconditioning and forwarding the subject-matter to the destination to which it is insured would exceed its value on arrival.

Constructive Total Loss Clause

14. 14.1 If any Increased Value insurance is effected by the Assured on the cargo insured herein the agreed value of the cargo shall be deemed to be increased to the total amount insured under this insurance and all Increased Value insurances covering the loss, and liability under this insurance shall be in such proportion as the sum insured herein bears to such total amount insured.

Increased Value Clause

In the event of claim the Assured shall provide the Underwriters with evidence of the amounts insured under all other insurances.

14.2 **Where this insurance is on Increased Value the following clause shall apply:**
The agreed value of the cargo shall be deemed to be equal to the total amount insured under the primary insurance and all Increased Value insurances covering the loss and effected on the cargo by the Assured, and liability under this insurance shall be in such proportion as the sum insured herein bears to such total amount insured.

In the event of claim the Assured shall provide the Underwriters with evidence of the amounts insured under all other insurances.

## BENEFIT OF INSURANCE

15. This insurance shall not inure to the benefit of the carrier or other bailee.

Not to Inure Clause

## MINIMISING LOSSES

16. It is the duty of the Assured and their servants and agents in respect of loss recoverable hereunder

Duty of Assured Clause

16.1 to take such measures as may be reasonable for the purpose of averting or minimising such loss,

and

16.2 to ensure that all rights against carriers, bailees or other third parties are properly preserved and exercised

and the Underwriters will, in addition to any loss recoverable hereunder, reimburse the Assured for any charges properly and reasonably incurred in pursuance of these duties.

17. Measures taken by the Assured or the Underwriters with the object of saving, protecting or recovering the subject-matter insured shall not be considered as a waiver or acceptance of abandonment or otherwise prejudice the rights of either party.

Waiver Clause

## AVOIDANCE OF DELAY

**18.** It is a condition of this insurance that the Assured shall act with reasonable despatch in all circumstances within their control.

Reasonable
Despatch Clause

## LAW AND PRACTICE

**19.** This insurance is subject to English law and practice.

English Law and
Practice Clause

*NOTE:- It is necessary for the Assured when they become aware of an event which is "held covered" under this insurance to give prompt notice to the Underwriters and the right to such cover is dependent upon compliance with this obligation.*

5/9/83
CL275 © Copyright The Institute of London Underwriters

**ENDORSEMENT NO. 6**
Annual Marine and War Deposit Premium

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to **Anheuser-Busch InBev**

Effective:  05/01/2010

It is understood and agreed that effective from the above captioned date:

## ANNUAL MARINE AND WAR DEPOSIT PREMIUM

The consideration for this policy of insurance from **May 1, 2010 to May 1, 2011** shall be a flat annual premium as follows:

Premiums Billed out of the United States: **$67,870** (China-Ocean: $37,500, Paraguay: $4,750, Uruguay $2,525, Chile $1,095, United States $17,000, U.K. $5,000).

Premiums Billed Locally: **$129,750** (China-Inland: $105,000; Argentina: $5,900; Bolivia: $6,100; Canada $12,750).  These local policy premiums do not include any local taxes and/or fees.

Coverage for Brazil, Germany and Belgium will be added to the policy at later effective dates by separate endorsements.

All other terms and conditions remain unchanged.

DATED: 07/08/2010
BROKER:MARSH USA

AGCS Marine Insurance Company

By: _____

# ENDORSEMENT NO. 7
## Disclosure Pursuant To Terrorism Risk Insurance Act

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to **Anheuser-Busch InBev**

Effective:  05/01/2010

**Disclosure Of Premium And Federal Share of Insured Losses (Pursuant To Terrorism Risk Insurance Act) – TR01 12 07**

**This Endorsement is attached to and made part of your policy in response to the disclosure requirements of the Terrorism Risk Insurance Act.**

### A.  Disclosure Of Premium

In accordance with the federal Terrorism Risk Insurance Act, as amended, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act, as amended.  The portion of your premium attributable to such coverage is shown in the policy Declarations.  This premium is based on the rates in effect at the time of policy issuance or policy anniversary and was calculated for the full term of the current policy period.

### B.  Disclosure Of Federal Participation In Payment Of Terrorism Losses

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceed $100 billion.

### C.  Cap On Insurer Participation In Payment Of Terrorism Losses

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act, as amended, exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, as amended, then we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

### D.  Definitions

The following definition is added with respect to the provisions of this endorsement:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the Terrorism Risk Insurance Act, as amended.  The criteria contained in the Terrorism Risk Insurance Act, as amended, for a **certified act of terrorism** include the following:

1.  The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act, as amended; and

2.  The act resulted in damage:
a.  Within the United States (including its territories and possessions and Puerto Rico); or
b.  Outside the United States in the case of:
    (1)  An air carrier (as defined in Section 40102 of title 49, United States code) or United states flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States) regardless of where the loss occurs; or
    (2)  The premises of any United States mission; and

3.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of the policy remain unchanged.

DATE: 07/08/2010
BROKER: MARSH USA

AGCS Marine Insurance Company

By: _____

© 2009 AGCS Marine Insurance Company. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

American Institute War Clauses (January 1994)

# AGCS MARINE INSURANCE COMPANY
## CHICAGO, IL

### WAR RISKS ONLY
### OPEN CARGO POLICY NO. OCW91183800

**ASSURED**

The AGCS MARINE INSURANCE COMPANY, hereinafter referred to as this Company, in consideration of premiums as agreed to be paid, does insure, lost or not lost,

Anheuser-Busch InBev
ONE BUSCH PLACE
SAINT LOUIS, MO 63118

for account of whom it may concern, against **WAR RISKS ONLY**, in accordance with the terms and conditions hereinafter set forth.

**LOSS PAYABLE**

Any loss payable hereunder shall be payable in funds current in the United States of America, to the order of the Assured, thirty days after full proofs of loss and proofs of interest have been filed with this Company.

**ATTACHMENT**

This insurance shall attach as provided in Clause 4, upon all those shipments made on and after 05/01/2010 which are insured against marine risks under Policy No. **OC91183800** of this Company, it being agreed that the description of such shipments, the valuations thereof, the voyage, the designation of the overseas Vessel (which shall be construed to include aircraft if included under the marine policy) on which the goods are to be carried and the ports and/or places of loading and discharge, as reported under the said Policy against marine risks, shall be deemed incorporated herein. Notwithstanding the foregoing, this policy shall not cover purely domestic shipments by air between points in the United States of America (excluding Alaska and Hawaii).

**LIMIT OF LIABILITY**

This Company shall not be liable hereunder for more than the applicable limit set forth in the marine policy.

In cases where the total value(s) at risk on any one vessel exceed(s) the limit of liability as set forth in this Policy, the Assured agrees, nevertheless, to report to the Company full value(s) at risk and to pay premium thereon at agreed rates. The Assured further agrees that acceptance of such reports and premium by the Company shall not serve to revoke or to overrule the limit of liability set forth in this Policy; however, subject to the limit of liability, the Company in accepting these reports does agree to pay partial losses covered by this Policy without reduction by reason of any coinsurance which otherwise may have existed in the absence of this special agreement.

Subject to the provisions of Clause 4 of this Policy, should there be an accumulation of interests exceeding the above limit of liability by reason of any interruption of transit beyond the control of the Assured or by reason of any casualty, and/or after the interests have been discharged from the incoming overseas Vessel at an intermediate port or place for on-carriage from that or any other port or place by another Vessel, and/or on the on-carrying overseas Vessel, this Policy shall attach for the full amount at risk (but in no event for more than twice the Policy limit which would be applicable to any one Vessel) provided written notice be given to this Company as soon as known to the Assured.

1. (a) This insurance is only against the risks of capture, seizure, destruction or damage by men-of-war, piracy, takings at sea, arrests, restraints, detainments and other warlike operations and acts of kings, princes and peoples in prosecution of hostilities or in the application of sanctions under international agreements, whether before or after declaration of war and whether by a belligerent or otherwise, including factions engaged in civil war, revolution, rebellion or insurrection, or civil strife arising therefrom; the imposition of martial law, military or usurped power, and including the risks of

| Anheuser-Busch InBev | War Risk Policy |
| Policy Number: OCW 91183800 | |

American Institute War Clauses (January 1994)

aerial bombardment, floating or stationary mines and stray or derelict torpedoes. Warranted not to abandon (on any ground other than physical damage to ship and cargo) until after condemnation of the property insured.

(b) This insurance also covers, but only while the property is on board a waterborne conveyance, loss or damage to said property directly caused by governmental authorities acting for the public welfare to prevent or mitigate a pollution hazard or threat thereof, provided that the accident or occurrence creating the situation which required such governmental action would have resulted in a recoverable claim under this Policy (subject to all of its terms, conditions and warranties) if the property insured would have sustained physical damage as a result of such accident or occurrence.

2.  Warranted free from any claim based upon loss of, or frustration of, the insured voyage or adventure caused by arrests, restraints or detainments.

3.  This insurance does not cover any loss, damage or expense directly or indirectly arising from, contributed to, or caused by any of the following whether due to a peril insured against or otherwise:

(a)  Commandeering, preemption, requisition or nationalization by the government (de facto or otherwise) of the country to or from which the goods are insured.

(b)  Seizure or destruction under quarantine, environmental or customs regulations.

(c)  Delay, deterioration and/or loss of market.

(d)  Nuclear reaction, radiation or radioactive contamination, regardless of how it was caused.

4.  (a)  The insurance against the risks enumerated in Clause 1, except the risk of floating or stationary mines and stray or derelict torpedoes, floating or submerged referred to in (b) below, shall not attach to the interest hereby insured or to any part thereof

    (i.)  prior to being on board an overseas Vessel (for the purpose of this Clause 4 an overseas Vessel shall be deemed to mean a Vessel carrying the interest from one port or place to another where such voyage involves a sea passage by that Vessel).

    (ii.)  after being discharged overside from an overseas Vessel at the intended port or place of discharge, or after the expiry of 15 days from midnight of the day of arrival of the overseas Vessel at the intended port or place of discharge, whichever shall first occur.

    (iii.)  after expiry of 15 days from midnight of the day of arrival of the overseas Vessel at an intermediate port or place to discharge the interest for on-carriage from that or any other port or place by another overseas Vessel, but shall reattach as the interest is loaded on the on-carrying overseas Vessel.  During the said period of 15 days the insurance remains in force whether the interest is awaiting transit or in transit between overseas Vessels.

    (iv.)  For the purposes of this Clause 4, arrival at the intended port or place of discharge shall be deemed to mean that time when the overseas Vessel first berths, anchors, moors or is secured in an area subject to regulation by the authorities of such port or place.

(b)  The insurance against the risks of floating or stationary mines or derelict torpedoes, floating or submerged, attaches as the interest hereby insured is first loaded on a lighter, craft or vessel after leaving the warehouse at point of shipment in transit for the destination declared hereunder, and ceases to attach as the interest is finally landed from the vessel, craft or lighter prior to delivery to warehouse at such destination.

(c)  If the contract of affreightment is terminated at a port or place other than the destination named therein such port or place shall be deemed the intended port or place of discharge for the purpose of this Clause 4 .

(d)  Shipments by mail, if covered by this Policy, are insured continuously from the time of leaving the sender's premises until delivered to the place of address.

(e)  Shipments by air (other than as air mail), if covered by this Policy are insured subject to the same terms and Conditions as shipments by overseas Vessel.

(f)  It is a condition of this insurance that the Assured shall act with reasonable dispatch in all circumstances within their control.

| Anheuser-Busch InBev<br>Policy Number: OCW 91183800 | War Risk Policy |
| --- | --- |

American Institute War Clauses (January 1994)

(g) If anything contained in this Policy shall be inconsistent with Clause 4 it shall to the extent of such inconsistency be null and void.

5. This insurance shall not be vitiated by deviation, overcarriage, change of voyage, or by any error or unintentional omission in the description of interest, vessel or voyage, provided the same be communicated to the Company as soon as known to the Assured and an additional premium paid if required.

6. And in case of any loss or misfortune, it shall be lawful and necessary to and for the Assured, his or their factors, servants and assigns to sue, labor and travel for, in and about the defense, safeguard and recovery of the said goods, and merchandises, or any part thereof, without prejudice to this insurance; nor shall the acts of the Assured or Company, in recovering, saving and preserving the property insured, in case of disaster, be considered a waiver or an acceptance of abandonment; and to the charges whereof, the said Company will contribute according to the rate and quantity of the sum hereby insured.

7. General Average and Salvage Charges payable according to United States laws and usage and/or as per Foreign Statement and/or as per York-Antwerp Rules (as prescribed in whole or in part) if in accordance with the Contract of Affreightment.

8. It is agreed that the reports of shipments made under the Policy against marine risks mentioned above shall be deemed to be reports under this Policy also, and the Assured agrees to pay premiums on all shipments insured under this Policy at the war risk rates of the Company as fixed from time to time.

9. No claim shall be payable hereunder which arises from collision, contact with any fixed or floating object (other than a mine or torpedo), stranding, heavy weather or fire unless caused directly (and independently of the nature of the voyage or service which the Vessel concerned or, in case of a collision, any other Vessel involved therein, is performing) by a hostile act by or against a belligerent power; and for the purposes of the paragraph "power" includes any authority maintaining naval, military or air forces in association with a power.

10. No recovery for a Constructive Total Loss shall be had hereunder unless the property is reasonably abandoned on account of its actual total loss appearing to be unavoidable, or because it cannot be preserved from actual total loss without an expenditure which would exceed its value if the expenditure had been incurred.

11. It is agreed that this Policy is a separate and wholly independent contract and is not subject to any terms or conditions of the Policy against marine risks above mentioned (whether physically attached thereto or not) except as such terms and conditions shall have been expressly incorporated herein by reference.

12. This insurance may be canceled by either party upon forty-eight hours written, telegraphic or telefaxed notice to the other party, but such cancellation shall not affect any shipment on which this insurance has attached under the terms of Clause 4 hereof prior to the effective date of such notice. Shipments on which this insurance has not so attached but for which, prior to the effective date of such notice, bills of lading have been issued and (in the case of exports) Certificates or special policies have been issued and negotiated, shall be covered from the time of loading on the overseas Vessel, as provided in Clause 4, at the rates of the Company, provided that, prior to said effective date, such shipments were at risk of the Assured and were covered under the said Policy against marine risks.

In the event of loss which may give rise to a claim under this Policy, prompt notice shall be given to this Company.

| Anheuser-Busch InBev Policy Number: OCW 91183800 | War Risk Policy |
|---|---|

Dated at Chicago  this 8 of July 2010.

In witness hereof, this Company has caused this Policy to be signed by its duly authorized officers but this Policy shall not be valid unless countersigned by an authorized representative of the Company.

_____
Secretary

_____
President

Countersigned By:

_____
AGCS Marine Insurance Company

| Anheuser-Busch InBev<br>Policy Number: OCW 91183800 | War Risk Policy |
| --- | --- |

 

Allianz Global Corporate & Specialty

# Allianz Global Corporate & Specialty®

Marine Insurance Policy

**Allianz ⑪**

Insurance Carrier: **AGCS MARINE INSURANCE COMPANY**

Issued to: **Anheuser-Busch InBev**

Agent or Broker Name and Address:   **MARSH USA**
**500 WEST MONROE**
**CHICAGO, IL 60661**

Underwriting Office: **Chicago**

Dear Valued Client,

As you may already know, Allianz Global Corporate & Specialty® and Fireman's Fund Insurance Company® have combined their marine insurance businesses to form a united global marine operation under a single brand – Allianz Global Corporate & Specialty (AGCS). By combining the two leading specialists within the Allianz group, you are now protected by one of the largest and strongest marine organizations in the world.

*This singular approach enables us to offer you an expanded global reach and a greater range of products and services at a local point of contact.* You can continue to rely on our expert underwriters, trusted loss control engineers and seasoned claims professionals.

All of us at Allianz Global Corporate & Specialty are extremely enthused about how the new organization is enhancing the capabilities and services we can offer you. We truly appreciate your business and want to thank you for choosing AGCS – the premier provider of Inland Marine & Related Property, Ocean Cargo, and Hull and Marine Liability insurance products.

Sincerely,

Hugh Burgess
Global Marine Head, Americas
Allianz Global Corporate & Specialty
AGCS Marine Insurance Company

 

Allianz Global Corporate &Specialty

# Allianz Global Corporate & Specialty®

Marine Insurance Policy



## Ocean Cargo Claim Reporting

Our highly skilled Marine Claims professionals are committed to providing our valued clients with the best service possible and they will respond quickly to any claim situation that you may have.

You can notify us of a new claim via any of the following reporting options:

| | |
|---|---|
| Telephone: | **800.558.1606**<br>**Outside of the US:  314.513.1353** |
| Email: | **FNOLMarine@agcs.allianz.com** |
| Fax: | **1-888-323-6450**<br>**Outside of the US:  314-513-1345** |
| Mailing Address: | **FNOL Marine Claims Unit**<br>**AGCS Marine Insurance Company**<br>**One Progress Point Parkway**<br>**O'Fallon, MO 63368** |

If possible, please include the following information in your claim notice or have it available for our customer service representative:

**Contact information**
**Policy #**
**Date of loss**
**Description of loss**

ENDORSEMENT NO. 8
Trip Transit

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to
**Anheuser-Busch InBev (Formerly ANHEUSER-BUSCH COMPANIES, INC.)**

Effective: 12/23/2010

It is hereby understood and agreed for an additional premium of **$1,500** coverage is extended from December 23,
2010 to January 15, 2011 as follows:

| | |
|---|---|
| **Interest Insured:** | New Glass Manufacturing Unit |
| **Limit of Liability:** | 850,000 USD any one truck |
| **Shipped From:** | Elmira, New York |
| **Shipped To:** | Houston, Texas |
| **Insuring Conditions:** | Per Policy Terms & Conditions |
| **Deductible:** | $5,000 any one accident or occurrence |

All other terms and conditions remain unchanged.

DATED: 05/04/2011
BROKER:MARSH USA

AGCS Marine Insurance Company

By: _____

*ENDORSEMENT NO.* _____9_____

Chicago,    May 1, 2011

Endorsement to be attached to and made part of Open Policy No. ___OC91183800___

of the        AGCS Marine Insurance Company

Issued to    **Anheuser-Busch InBev**

## ANNUAL MARINE AND WAR DEPOSIT PREMIUM

The consideration for this policy of insurance from **May 1, 2011 to May 1, 2012** shall be a flat annual premium as follows:

Premiums Billed out of the United States: **$102,294** (China-Ocean: $40,000, Paraguay: $5,700, Uruguay $3,030, Chile $1,314, United States: $17,000, Germany: $20,250, Belgium $10,000, U.K. $5,000).

Premiums Billed Locally: **$303,200** (China-Inland: $120,000; Brazil: $150,000; Argentina: $7,080; Bolivia: $7,320; Canada $18,800). These local policy premiums do not include any local taxes and/or fees.

All other terms and conditions remain unchanged

Authorized Signature

## ENDORSEMENT NO. 10
### Trip Transit

Attached to and made part of Policy No. OC91183800 of the AGCS MARINE INSURANCE COMPANY issued to **Anheuser-Busch InBev (Formerly ANHEUSER-BUSCH COMPANIES, INC.)**

Effective: 10/14/2011

It is hereby understood and agreed for an additional premium of **$750.00** coverage is extended for the following shipment as follows:

**Interest Insured:** Computer Equipment
**Limit of Liability:** $94,000 any one truck
**Shipped From:** Manitowoc, WI
**Shipped To:** St.Louis, MO
**Insuring Conditions:** Per Policy Terms & Conditions
**Deductible:** $2,500 any one accident or occurrence

All other terms and conditions remain unchanged.

DATED: 11/17/2011
BROKER:MARSH USA

AGCS Marine Insurance Company

By: _____

*ENDORSEMENT NO.* _____10_____

Chicago,   May 1, 2012

Endorsement to be attached to and made part of Open Policy No.        OC91183800
of the      AGCS Marine Insurance Company
Issued to   **Anheuser-Busch InBev**

## ANNUAL MARINE AND WAR DEPOSIT PREMIUM

The consideration for this policy of insurance from **May 1, 2012 to May 1, 2013** shall be a flat annual premium as follows:

Premiums Billed out of the United States: **$107,405** (China-Ocean: $45,111, Paraguay: $5,700, Uruguay $3,030, Chile $1,314, United States: $17,000, Germany: $20,250, Belgium $10,000, U.K. $5,000).

Premiums Billed Locally: **$338,637** (China-Inland: $135,334; Brazil: $169,168; Argentina: $7,080; Bolivia: $8,255; Canada $18,800).  These local policy premiums do not include any local taxes and/or fees.

All other terms and conditions remain unchanged

_____
Authorized Signature

*ENDORSEMENT NO.* _____ *11* _____

Chicago,   May 1, 2012 _____

Endorsement to be attached to and made part of Open Policy No.         OC91183800 _____
of the        AGCS Marine Insurance Company _____
issued to    **Anheuser-Busch InBev** _____

## DEDUCTIBLE ENDORSEMENT

Effective May 1, 2012, it is hereby understood and agreed that the deductible clause 13 in the policy is amended as follows:

13.1    A deductible of **$2,500 ($3,500 on policies issued in China, Bolivia and Brazil)** shall apply to any one Loss; however, this deductible shall not apply general average, salvage or special charges; except for hops, barley, rice and other grains shipped in bulk where the normal trade loss of one half of one percent (1/2 of 1%) would apply.

13.2    The deductible shall not be applied so as to reduce This Insurer's obligation to pay the full amount of any limit(s) of liability set forth in this policy

All other terms and conditions remaining unchanged.

_____
Authorized Signature

*ENDORSEMENT NO.* _____12_____

Chicago,    May 1, 2013

Endorsement to be attached to and made part of Open Policy No.    ___OC91183800___
of the     AGCS Marine Insurance Company
Issued to    **Anheuser-Busch InBev**

## ANNUAL MARINE AND WAR DEPOSIT PREMIUM

The consideration for this policy of insurance from **May 1, 2013 to May 1, 2014** shall be a flat annual premium as follows:

Premiums Billed out of the United States: **$120,969** (China-Ocean: $50,808, Paraguay: $6,420, Uruguay $3,413, Chile $1,480, United States: $19,147, Germany: $22,807, Belgium $11,263, U.K. $5,631).

Premiums Billed Locally: **$436,585** (China-Inland: $152,423; Brazil: $190,529; Argentina: $7,974; Bolivia: $9,298; Canada $21,174; Dominican Republic: $55,187).  These local policy premiums do not include any local taxes and/or fees.

All other terms and conditions remain unchanged

_____
Authorized Signature

## SCHEDULE OF RATES

Attached to and forming part of Policy No. **OC91183800** of the **AGCS Marine Insurance Company**

These rates are effective with respect to all shipments of insured goods and/or merchandise and/or property made on and after **May 1, 2013** , which are shipped on metal-hulled, self-propelled vessels which are not over 20 years of age nor less than 1000 net registered tons and which are classed A1 American Record or equivalent by a member of the International Association of Classification Societies; or vessels over 20 years of age which are approved by This Insurer, and which are not less than 1000 net registered tons and classed as above, but only while operating in their regular trade; but in either case excluding vessels built:

>     for service on the Great Lakes;
>     solely for military or naval service; or
>     for carriage of dry bulk or liquid bulk cargoes and which are more
>     than 15 years of age, unless specifically approved by This Insurer.

All shipments of insured goods and/or merchandise and/or property which are made on vessels excluded or not provided for by the above wording are covered at rates to be arranged.


**INTEREST:**                                                  **RATE:**

Marine/War                                                     FLAT


All other shipments and/or interests at rates to be agreed.

Marine rates subject to change upon ninety (90) days notice from This Insurer.